## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**AGILITY PUBLIC WAREHOUSING COMPANY K.S.C.P.**
Sulaibia, P.O. Box 25418
Safat 13115
Kuwait City, Kuwait

**AGILITY DGS LOGISTICS SERVICES COMPANY K.S.C.C.**
Sulaibia, P.O. Box 25418
Safat 13115
Kuwait City, Kuwait

**PWC TRANSPORT COMPANY W.L.L.**
Sulaibia, P.O. Box 25418
Safat 13115
Kuwait City, Kuwait

      Plaintiffs,

        *v.*

**U.S. DEPARTMENT OF DEFENSE**
1400 Defense Pentagon
Washington, DC 20301

**STEPHEN W. PRESTON,**
*General Counsel,*
*U.S. Department of Defense*
1600 Defense Pentagon
Washington, DC 20301

**ROBERT E. EASTON,**
*Director, Office of Litigation Counsel,*
*U.S. Department of Defense*
1600 Defense Pentagon
Washington, DC 20301

**DEFENSE LOGISTICS AGENCY**
8725 John J. Kingman Road
Fort Belvoir, VA 22060

Civil Action No. _____

**FRED T. PRIBBLE,**
*General Counsel,*
*Defense Logistics Agency*
8725 John J. Kingman Road
Fort Belvoir, VA 22060

**JAMES M. COYNE,**
*Deputy General Counsel,*
*Defense Logistics Agency*
8725 John J. Kingman Road
Fort Belvoir, VA 22060

**DANIEL K. POLING,**
*Associate General Counsel,*
*Defense Logistics Agency*
8725 John J. Kingman Road
Fort Belvoir, VA 22060

**NOËL WOODWARD,**
*Former Associate General Counsel,*
*Defense Logistics Agency*
8725 John J. Kingman Road
Fort Belvoir, VA 22060

     Defendants.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**1.**     This action arises under the Administrative Procedure Act, 5 U.S.C.

§§ 500 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

**2.**     Plaintiffs Agility Public Warehousing Company K.S.C.P., Agility DGS

Logistics Services Company K.S.C.C., and PWC Transport Company W.L.L.

(hereinafter "Agility") seek injunctive and other appropriate relief that will allow them to

obtain information critical to their defense in meritless litigation captioned Kuwait &

Gulf Link Transport Company, et al. ["KGL"], v. Doe, et al., No. 2012-1820 Civil Term,

Court of Common Pleas, Cumberland County, Pennsylvania (the "Pennsylvania Litigation").

    **3.**    Specifically, Agility requests that this Court enter an order compelling Defendants to authorize deposition testimony of officials of the Defense Logistics Agency ("DLA") who have critical information relating to the key issues in dispute in the Pennsylvania Litigation that is not available from other sources, including DLA contracting officer Medard Kowalski and former DLA official Normand Lussier.

    **4.**    Agility has previously sought both documents and deposition testimony from DLA for use in the Pennsylvania Litigation.  DLA agreed to produce such documents and make Mr. Kowalski and Mr. Lussier available for depositions only after litigation before this Court,  see Agility Public Warehousing Co., et al., v. Department of Defense, et al., No. 14-1064 (JDB), despite producing documents to KGL, and making DLA witnesses available to KGL upon oral request, on multiple occasions, without adherence to the Touhy process.[1]  DLA's prior disclosure of documents has been woefully insufficient to preserve Agility's right to defend itself in the Pennsylvania Litigation.

    **5.**    For example, nearly 3,000 pages of key documents related to DLA, and which DLA should have in its possession, custody and control, were produced by the plaintiffs in the Pennsylvania Litigation weeks *after* Agility's examination of former DLA employee Mr. Lussier (and only a few days before the plaintiffs in the Pennsylvania Litigation were scheduled to begin their own examination of Mr. Lussier).  The majority of these documents – consisting of communications between KGL and DLA relating to

---

[1]    United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951).

Agility and/or aspects of the Pennsylvania Litigation – had not been produced by DLA in connection with the prior litigation before this Court. However, because the documents were sent or received by DLA employees and the vast majority included search terms that DLA represented it ran across relevant custodians, they should have been identified and produced more than a year ago by DLA itself. The failure to produce these documents calls into question the adequacy of the government's document collection and discovery efforts, and possibly suggests spoliation of evidence. For example, over 20 newly-produced documents reveal that a DLA official forwarded information to KGL's counsel on a single day, the same day that KGL filed its complaint in the Pennsylvania Litigation; that those documents were not picked up by DLA's own search is highly concerning.

6. These documents also show that DLA's previous assertions of various privileges and redactions of responsive documents were misplaced and unsupportable, because documents over which the government asserted privileges were in fact provided by Mr. Lussier to third parties in real time, and recently produced by KGL in unredacted form to Agility in the Pennsylvania Litigation. Some of these documents were also the subject of a motion to compel or, in the alternative, motion for partial summary judgment filed in the prior litigation before this Court. Thus, the production of these documents – unredacted – a year later by a third party calls into question not only the government's privilege assertions, but also its representations to this Court. Such prior representations have now been revealed to be entirely without merit, a fact that was known (or should have been known) to the government at the time the representations were made.

7. DLA's faulty document production and erroneous privilege assertions were overseen by Defendant Poling, who has submitted a number of declarations in

connection with these matters and appears to have been involved in the procurement of two other declarations by DLA officials that were later discovered to be materially false (and that DLA requested be withdrawn from the Pennsylvania Litigation as a result).  The government has been on notice since 2014 that Agility views Defendant Poling as a key witness in the Pennsylvania Litigation because of his personal involvement in the underlying facts of the matter, yet the Department of Justice appears to have abdicated its responsibility for document collection to him.  Agility has asked the government to explain not only the circumstances of the unproduced and improperly redacted documents, but also Defendant Poling's role in these matters, and reserves the right to seek sanctions or other appropriate relief for this misconduct.  See Ex. 1.

**8.**      Additionally, during the course of Mr. Lussier's deposition, government counsel repeatedly and improperly instructed the witness not to answer questions relating to bias and impeachment despite an agreement between the parties that bias was squarely within the scope of the deposition.  This is particularly troublesome given that the witness explicitly testified that he was, in fact, biased against Agility and would be happy to see anything bad happen to Agility.  Indeed, government counsel objected to questions showing bias because they touched upon a purportedly unrelated topic – unrelated criminal litigation between Agility and the government – notwithstanding the fact that the newly produced documents show that Mr. Lussier had, in fact, ***forwarded highly confidential settlement communications between Agility and the government in unrelated criminal litigation*** (including materials prepared by Agility's counsel and a

formal settlement offer executed by its CEO in 2009, pursuant to Fed. R. Evid. 408) *to the plaintiffs in the Pennsylvania Litigation*.[2]

9.      Finally, even in those instances where Mr. Lussier has been permitted to testify to relevant information, the witness frequently has contradicted his own prior testimony, has been evasive or has disclaimed knowledge of matters within the knowledge of other DLA witnesses, including Defendant Poling, Defendant Woodward, and Defendant Pribble.  Testimony from other DLA officials is therefore necessary to provide a complete factual record for Agility's defense of the Pennsylvania Litigation.

## BACKGROUND

10.      The Pennsylvania Litigation is a private defamation action brought against Agility by one of its competitors, KGL.  The U.S. government is not a party to the Pennsylvania Litigation and has no legally cognizable interest in the outcome of that case.

11.      In its complaint in the Pennsylvania Litigation, KGL alleged that on March 22 and March 24, 2011, one or more Agility employees, using the pseudonym "Scott Wilson," sent two letters to officials at DLA and other government agencies that accused KGL of maintaining a relationship with Iranian shipping companies sanctioned by the U.S. government for their ties to Iran's nuclear proliferation program.

---

[2]      As a result of the eleventh-hour production of previously undisclosed KGL-DLA communications in the Pennsylvania Litigation, Mr. Lussier's deposition has not yet concluded, and Agility therefore reserves the right either to seek to reopen the prior matter or to amend its complaint in this action once issues related to Mr. Lussier and/or this production of documents are ripe for consideration.  Indeed, Mr. Lussier did not even appear for the continuation of his deposition on March 2, 2016 after the government advised Agility that they were not ready to proceed because of the newly produced documents from KGL.  The government has refused to identify who instructed Mr. Lussier not to attend the deposition.

12.     In order to substantiate its defamation claim against Agility, KGL must prove, among other things, that KGL suffered actual, reputational harm as a result of the so-called "Wilson Letters."  In attempting to prove that it suffered such harm, KGL has relied almost exclusively upon an argument that the letters harmed KGL's government contracting business and relationship with DLA.

13.     In truth, KGL did not suffer reputational harm as a result of the Wilson Letters.  In fact, DLA not only maintained a favorable opinion of KGL following the Wilson Letters, but also awarded KGL each and every contract on which it bid thereafter and joined forces with KGL in an effort to expose the whistleblower(s) behind the Wilson Letters.  Indeed, from the inception of the Pennsylvania Litigation, DLA has continuously provided disparate treatment to Agility and KGL – e.g., providing KGL access to a number of government officials and employees, including Defendant Poling and Defendant Woodward, without requiring compliance with the Department of Defense's Touhy regulations, as well as sharing substantial, internal DLA documentation with KGL, without a Touhy request or FOIA compliance.[3]

14.     Moreover, DLA was aware of allegations regarding KGL's ties to Iran made by various third parties – including various members of Congress – as early as 2010 – long before it received the Wilson Letters.  See, e.g., Exs. 2 – 11.  Indeed, KGL has admitted in its own amended complaint that it maintained an ongoing relationship with the sanctioned Iranian shipping companies identified in the letters and was merely "in the

---

[3]     The newly produced documents show that KGL's counsel, with assistance from DLA, also spoke to Sharon Woods of the Defense Criminal Investigative Service without compliance with Touhy.  In addition to using Touhy to restrict Agility's access to government employees who were made available to KGL without any such request, the government has, even when faced with a Touhy request from KGL, granted such request almost immediately (i.e., within a day) while forcing Agility to engage in lengthy and expensive litigation to obtain access to those same individuals.

process of severing all connections to the sanctioned Iranian entities" at the time of the Wilson Letters.  See Ex. 12, Am. Compl. ¶¶ 48, 75–77; see also Exs. 13 – 15 (documents produced by KGL in discovery in the Pennsylvania Litigation reflecting its extensive and sustained relationship with the sanctioned entities).  Despite these repeated allegations of KGL's ongoing ties to Iran – and KGL's own admissions in this regard – DLA continued to ignore the allegations and to award KGL lucrative government contracts.  See Ex. 16.

15.     Indeed,  while KGL had improper ties to Iran, KGL at the same time maintained an "inside source" within DLA: Mr. Lussier.  See Ex. 17.  With the knowledge and, frequently, assistance of others within DLA, including Defendants Poling, Woodward, and Pribble, Mr. Lussier provided unprecedented assistance to KGL by way of access to witnesses and documents, all outside the federal regulatory process, and often in violation of DLA's own privacy admonitions.  See, e.g., Ex. 18

16.     Although not a party to the underlying litigation, the government, through DLA and its employees, has partnered with KGL in its meritless litigation against Agility, even going so far as to formalize that collaboration in a purported common-interest privilege until such privilege was soundly rejected by the Pennsylvania court as "border[ing] on the frivolous."  As described in greater detail below, DLA and its employees:

a.     leaked the Wilson Letters, which alleged serious wrongdoing by KGL, to KGL's counsel shortly after receiving them by sending them to an attorney representing a KGL subcontractor with the intent that the attorney forward them to KGL;

    **b.**     provided KGL's counsel with the information necessary to trace the Wilson Letters to an IP address registered to Agility;

    **c.**     attempted to obtain documents gathered by federal law enforcement officials regarding an investigation into KGL's ties to sanctioned Iranian entities from law enforcement under false pretenses, at the request of KGL's counsel;

    **d.**     forwarded confidential communications regarding the government's investigation of the Wilson Letters to KGL's counsel – including, as evidenced by a recent production of document by KGL, more than twenty documents forwarded by a DLA official to KGL's counsel on the same day KGL's complaint was filed in the Pennsylvania Litigation;

    **e.**     executed materially false declarations at the request of KGL's counsel (outside the <u>Touhy</u> process) purporting to supply the necessary evidentiary support for KGL's claims, which, after Agility proved such falsities via documentary evidence and its examination of Mr. Lussier,  DLA later requested be withdrawn in light of the conceded misstatements therein;

    **f.**     executed, via Defendant Poling, a declaration admitting that it was working with KGL's counsel because DLA had an interest in learning the identity of Scott Wilson so that DLA could assess whether Mr. Wilson engaged in a criminal offense under 18 U.S.C. § 1001;

    **g.**     conspired with KGL's counsel to conceal relevant communications from discovery through the assertion of a common interest privilege – supported

by a declaration executed by Defendant Poling – that the Pennsylvania court rejected and found to "border[] on the frivolous;" and

       **h.**      leaked a confidential, Rule 408-protected settlement discussion and other confidential information to KGL related to criminal litigation pending between DLA and Agility, prejudicing Agility.

      **17.**      DLA is assisting KGL in the Pennsylvania Litigation – even though KGL has essentially conceded that the litigation is meritless by admitting its ongoing ties to Iran in the very complaint it filed – because it is biased against Agility and seeks to gain leverage for federal prosecutors involved in unrelated criminal and *qui tam* matters pending against Agility in the United States District Court for the Northern District of Georgia.  In fact, DLA-official Mr. Lussier, acting within the scope of his employment, went so far as to share documents relating to Agility's unrelated criminal and *qui tam* matters with KGL in connection with the Pennsylvania Litigation – including Defendant Poling's analysis of certain issues relevant to those matters.  See, e.g., Ex. 19.

      **18.**      DLA's bias against Agility is explicit and conceded.  For example, Mr. Lussier has testified that he is biased against Agility, that anything having to do with Agility "clouded [his] judgment," that he "would be in favor of something bad happening to Agility" (in fact, "the badder the better"), and that he would have been happy to see Agility indicted under 18 U.S.C. § 1001 in connection with the Wilson Letters as that would be bad for Agility.  See Ex. 20, Lussier Dep. 48:21-49:2, 293:7-294:10, Dec. 15, 2015.

      **19.**      Additionally, DLA attorney Daniel Poling has stated in a sworn declaration submitted in the Pennsylvania Litigation that DLA was working with KGL in

order to generate potential criminal charges against Agility employees.  See Ex. 21.
Indeed, documents produced by DLA show that Defendant Poling also was exchanging
emails with federal prosecutors in the Northern District of Georgia handling unrelated
civil and criminal litigation between DLA and Agility regarding the Pennsylvania
Litigation, in an effort to gin up criminal charges against Agility.

    **20.**    To defend itself from KGL's meritless allegations, Agility seeks evidence
from DLA regarding its response to the Wilson Letters and its role in the Pennsylvania
Litigation, including the full extent of its bias against Agility.  To that end, Agility
submitted requests for testimony from current and former DLA officials Fred T. Pribble,
Daniel K. Poling, and Noël Woodward pursuant to the Department of Defense's Touhy
regulations.  However, in contrast with DLA's willingness to provide KGL unfettered
access to its employees as requested by KGL, as well as confidential government
information, without complying with the required Touhy regulations, the government has
improperly erected procedural roadblocks to prevent Agility from questioning these very
same employees on the record about their knowledge of facts central to the Pennsylvania
Litigation.

    **21.**    The testimony of these three DLA officials is critically important to
Agility's defense.  This lawsuit seeks relief necessary to remedy the ongoing prejudice to
Agility's defense efforts in the Pennsylvania Litigation caused by DLA's arbitrary and
capricious disparate treatment of Agility and KGL in that matter.

## JURISDICTION AND VENUE

    **22.**    The Court has jurisdiction over the subject matter and the parties to this
suit pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, and 28 U.S.C. § 2201.

23.     The denial of Agility's <u>Touhy</u> requests for deposition testimony from Defendants Pribble, Poling, and Woodward constitutes "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

24.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1) because this is an action against an agency of the United States, at least one defendant resides in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

25.     The Plaintiffs are Kuwaiti logistics companies.  Agility and its affiliates provide integrated logistics services, including air, ocean, and ground freight forwarding, warehousing and distribution services, and industrial real estate management.  Agility has provided logistics services to the United States government.

26.     Defendant U.S. Department of Defense ("DOD") is an executive department of the United States government, <u>see</u> 10 U.S.C. § 111, and is an "agency" within the meaning of 5 U.S.C. § 701.

27.     Defendant Steven W. Preston is the General Counsel for DOD. Mr. Preston is authorized to release official DOD information in litigation and to permit DOD personnel to be interviewed, contacted, or used as witnesses concerning official DOD information or as expert witnesses pursuant to 32 C.F.R. § 97.6.

28.     Defendant Robert E. Easton is the Director of the Office of Litigation Counsel for DOD.  Mr. Easton is authorized to release official DOD information in litigation and to permit DOD personnel to be interviewed, contacted, or used as witnesses concerning official DOD information or as expert witnesses pursuant to 32 C.F.R. § 97.6.

29.     Defendant Defense Logistics Agency is a component of DOD that provides combat support logistics for the military and certain federal agencies, and is an "agency" within the meaning of 5 U.S.C. § 701.

30.     Defendant Fred T. Pribble is the General Counsel for DLA. Defendant Pribble is authorized to release official DOD information in litigation and to permit DOD personnel to be interviewed, contacted, or used as witnesses concerning official DOD information or as expert witnesses pursuant to 32 C.F.R. § 97.6.  He is or was the supervisor of the other DLA officials named as defendants in this matter, and is subject to a valid <u>Touhy</u> request from Agility for deposition testimony.

31.     Defendant James M. Coyne is the Deputy General Counsel for DLA. Mr. Coyne is authorized to release official DOD information in litigation and to permit DOD personnel to be interviewed, contacted, or used as witnesses concerning official DOD information or as expert witnesses pursuant to 32 C.F.R. § 97.6.

32.     Defendant Daniel K. Poling is the Associate General Counsel (Litigation) and Chief Trial Attorney for DLA.  He voluntarily submitted a declaration on behalf of KGL in the Pennsylvania Litigation within his official capacity as a DLA employee. Upon information and belief, Defendant Poling did so outside the <u>Touhy</u> process. Defendant Poling is subject to a valid <u>Touhy</u> request from Agility for deposition testimony.

33.     Defendant Noël Woodward was the Associate General Counsel (Business Integrity) for DLA from approximately 2011 to 2013.  Upon information and belief, Defendant Woodward is currently an attorney at the U.S. Army's Northern Law Center, Office of the Staff Judge Advocate, 21st Theater Sustainment Command.  DLA gave

KGL's counsel permission to contact Defendant Woodward without requiring compliance with the Touhy process. She is subject to a valid Touhy request from Agility for deposition testimony.

### THE PENNSYLVANIA LITIGATION

34.    On February 28, 2011, DLA awarded a contract to a KGL subsidiary to operate a military storage and distribution depot in Kuwait (the "DDKS contract"). In order to obtain the DDKS contract, KGL was required to certify to the government that it did not engage in certain transactions with sanctioned Iranian entities, and did in fact make such certification. However, as already noted, KGL, by its own admission, had an ongoing relationship with sanctioned Iranian shipping entities at the time of that certification.

35.    On March 22 and March 24, 2011, one or more whistleblowers using the pseudonym "Scott Wilson" emailed a pair of letters to DLA contracting officer Medard Kowalski, as well as other U.S. government officials, regarding ties between KGL and sanctioned Iranian shipping companies. As already alleged, the "Wilson Letters" were substantially true because KGL admittedly did have an ongoing relationship with the sanctioned Iranian entities mentioned in the letter, and DLA was already aware of allegations made by third parties regarding that relationship. See supra ¶ 14.

36.    Immediately after receiving the Wilson Letters, then-DLA Associate General Counsel Normand Lussier (i.e., KGL's "inside source") forwarded the letters to Wayne Keup, counsel for a KGL subcontractor. See Exs. 22 – 23. Mr. Lussier sent the Wilson Letters to Mr. Keup with the expectation that Mr. Keup would provide them to KGL's counsel. See Ex. 24, Lussier Dep. 266:10–267:1, June 29, 2015. Indeed, the

newly-produced documents underscore that Messrs. Keup, Hammond, and Lussier were in close communication – even months before the Wilson Letters were sent.  See Ex. 18.

37.     This sharing of information outside of DLA was not an isolated occurrence.  For example, following the initial forwarding of the Wilson Letters, DLA continued to furnish information regarding the Wilson Letters to others outside of DLA, including KGL's counsel.  On July 14, 2011, Mr. Lussier forwarded an internal DLA discussion about the Wilson Letters to KGL's counsel.  See Ex. 25.  On March 21, 2012, Mr. Lussier forwarded to KGL's counsel a large tranche of documents, including internal DLA email chains related to law enforcement's investigation of Scott Wilson, and on June 15, 2013, forwarded another tranche of documents.  See Exs. 26-27.  At least one of the emails Mr. Lussier forwarded outside of the agency included a legend stating that the message "contains LAW ENFORCEMENT SENSITIVE and/or PRIVACY ACT PROTECTED information" and that it was not to be "disseminate[d] without . . . permission."  See Ex. 26.

38.     At a time when DLA should have been investigating the serious allegations in the Wilson Letters, DLA instead took sides and eagerly assisted KGL's litigation efforts by, among other things, providing KGL's counsel with key information necessary to trace the Wilson Letters to Agility and to establish "jurisdictional facts" for KGL's lawsuits.  All of this was done without requiring KGL to go through the Touhy or FOIA processes.

39.     For example, in July 2011, KGL's counsel asked Mr. Lussier to find out if Scott Wilson sent the Wilson Letters in hard copy.  In response, Mr. Lussier agreed to "try to run it down."  Ex. 28.  The next day, Mr. Lussier forwarded an email chain

containing the email header information from Scott Wilson (showing a "g-mail" email address for Scott Wilson) as well as discussion amongst DLA officials as to whether they had received a hard copy of the letter in the mail.  Ex. 25.  In response, KGL's counsel stated that "[t]he g-mail account is the first solid lead on the identity of Scott Wilson." Id.  Later, KGL's counsel worked with other U.S. government officials, including those at DLA, to obtain the original emails that DLA received from Scott Wilson.  See Exs. 29-31.  As a direct result of assistance from U.S. government officials, KGL traced the Wilson Letters to an IP address registered to Agility.  See Ex. 32.  Thus, DLA succeeded in providing KGL with the "jurisdictional facts" for its lawsuits against Agility.

40.     Also in July 2011, DLA attempted to obtain information regarding law enforcement's investigation into KGL's ties to Iran under false pretenses: despite representing to law enforcement officials that DLA sought information for a responsibility determination, DLA, upon information and belief, actually planned to turn the information over to KGL's counsel.  Specifically, at the request of KGL's counsel, Defendant Woodward and Mr. Lussier sought to obtain from law enforcement copies of "white binders" that allegedly contained copies of KGL documents evidencing its ties with sanctioned Iranian entities.  On July 7, 2011, Defendant Woodward justified her request for these documents to Kathy Shaw, the Deputy IG at DLA, by providing the false reasoning that DLA and the Army had contracts with KGL and "need[ed] to make sure [they were] still dealing with a presently responsible contractor."  Ex. 33; see also Ex. 20, Lussier Dep. 185:18-186:1, Dec. 15, 2015.  Kathy Shaw responded on July 21, 2011 and suggested that Defendant Woodward contact a DOJ trial attorney to request a copy of the binders.  See Ex. 33.  Defendant Woodward contacted the DOJ trial attorney,

and relayed the communication to Mr. Lussier.  Id.  On July 25, Mr. Lussier contacted

KGL's counsel and provided him with the information Defendant Woodward obtained

from law enforcement, and stated, in part: "we are not going to push anymore least [sic]

we get ourselves in trouble."  Ex. 34.  Indeed, Mr. Lussier essentially admitted the falsity

of the purported basis for the request for documents (i.e. "present responsibility"), and

agreed during his deposition that "[t]he real reason [Mr. Lussier and Defendant

Woodward were looking for copies of the 'white binders' was] because of a request that

Mr. Hammond [KGL's counsel] had made[.]"  Ex. 20, Lussier Dep. 186:10-16, Dec. 15,

2015.

41.     On January 26, 2012, in another extraordinary example of improper

collaboration between DLA and KGL, a DLA official forwarded to KGL's counsel a

tranche of highly confidential documents, including a highly confidential settlement offer

from Agility in unrelated criminal litigation, protected by federal law (i.e., Federal Rule

of Evidence 408), and a letter outlining McNulty factors from Agility's counsel.

Notably, even though this communication was sent by a DLA official, and fell squarely

within Agility's document request to DLA, it was not produced by DLA to Agility, but

instead was only recently produced to Agility by KGL in the Pennsylvania Litigation –

and only after Agility had concluded its direct examination of the DLA official.

42.     Having received assistance from the government in learning of the Wilson

Letters, obtaining confidential information regarding the government's investigation of

those letters  as well as the government's broader relationship with Agility, and receiving

jurisdictional facts purporting to trace the letters to Agility, KGL initiated the

Pennsylvania Litigation on or around March 21, 2012 in an effort to identify the

whistleblower(s) responsible for the letters, punish Agility for its role, if any, in attempting to bring KGL's misconduct to the government's attention, and try to get it prosecuted in Atlanta.[4]

43.    Consistent with these efforts, KGL's discovery in the Pennsylvania Litigation has focused almost entirely upon learning the identity of "Scott Wilson," although such information, as even noted by the Pennsylvania court, is not necessary to secure relief in that matter.  Agility objected to such discovery on the ground that KGL could not satisfy the requirements set forth by Pennsylvania law for a defamation plaintiff to compel identification of a John Doe defendant.  See Pilchesky v. Gatelli, 12 A.3d 430 (Pa. Super. Ct. 2011).  One requirement imposed by Pilchesky is that a plaintiff must make a prima facie showing of defamation prior to obtaining the identity of the anonymous defendant.

44.    In connection with KGL's motion on this issue, DLA actively inserted itself into the Pennsylvania Litigation to assist KGL, again to the substantial detriment of Agility.  On December 4, 2012, KGL filed a motion with the Pennsylvania court seeking to compel Agility to respond to discovery aimed at identifying "Scott Wilson."  KGL renewed this motion on July 12, 2013.  In support of its motions, KGL attached declarations executed by two DLA officials, Mr. Kowalski and Mr. Lussier.  These declarations, which were drafted by KGL's counsel and reviewed by Defendant Poling, described DLA's response to the Wilson Letters in a manner that purported to substantiate a prima facie defamation claim and were central to KGL's claim that the

---

[4]    Between October 31, 2011 and March 21, 2012, KGL and two of its subsidiaries filed nearly identical defamation actions against "Scott Wilson," Agility, and three of Agility's U.S. subsidiaries in state courts in the District of Columbia, Virginia, and Pennsylvania.  Of the three lawsuits, only the Pennsylvania Litigation is still pending; the other two have been dismissed.

identity of the anonymous speaker should be revealed, despite the substantial free speech implications.  Indeed, Mr. Lussier's declaration purported to address the specific deficiency the judge in the Pennsylvania Litigation had recognized in connection with KGL's original effort to unmask the speaker's identity.  As discussed below, however, the declarations were materially and knowingly false in a number of respects.  (See infra ¶¶ 58–60.)

45.     The Pennsylvania trial court initially granted KGL's motion to compel, which had relied upon the materially false declarations from DLA employees.  The court concluded that the First Amendment, as interpreted by Pilchesky, did not protect the Wilson Letters.  However, on May 6, 2014, the Pennsylvania Superior Court vacated the trial court's order and remanded for application of the Pilchesky test.  See Kuwait & Gulf Link Transp. Co. v. Doe, 92 A.3d 41 (Pa. Super. Ct. 2014).  The Superior Court held that "the Wilson Letters constitute anonymous or pseudonymous political speech" and that they therefore "are entitled to the highest level of protection . . . under the First Amendment."  Id. at 49–50.

46.     Following additional discovery, KGL renewed its attempts to overcome Pilchesky.  At the same time, Agility moved for summary judgment.  On December 8, 2015, the Pennsylvania trial court entered an order denying both motions.  The court concluded that "the quantity and quality of the evidence of defamation presented in this case does not outweigh the right of pseudonymous speech in this case," and that the author of the Wilson Letters therefore need not be unmasked.  Ex. 35, Order at 10.  It explained that "[w]hile [KGL has] advanced a prima facie case for defamation, it is not, in our view, a strong one[,]" and that "[w]ithout prejudging the issue, we readily

understand the defendants' arguments that a defamatory effect can be derived from the Wilson Letters only by misconstruing them." Id. at 9. The court further explained that it "agree[s] with the defendants that there is little evidence of harm in this case." Id. The court declined, however, to grant summary judgment because it could not "conclude, with any certainty, that discovery is, in fact, at an end." Id. at 11.

47.    As a result of the Pennsylvania court's order, the case remains pending and will proceed without KGL learning the identity of "Scott Wilson." No trial date or discovery deadlines have been set in the Pennsylvania Litigation. Agility continues to take steps to expeditiously seek to develop an evidentiary record in order to bring to a close KGL's meritless litigation, which has been pending for nearly four years.

## AGILITY'S PRIOR DISCOVERY EFFORTS

48.    In response to KGL's efforts to substantiate its defamation claims using the testimony of DLA employees, Agility sought to obtain documents and deposition testimony that would shed light on DLA's role in the Pennsylvania Litigation and further Agility's defense of the matter. Agility's efforts have included party discovery of KGL as well as Touhy requests directed to DLA and those DLA employees involved in assisting KGL in the Pennsylvania Litigation.

### Requests for Testimony from DLA, Mr. Kowalski and Mr. Lussier

49.    On March 6, 2014, Agility served Mr. Kowalski, Mr. Lussier, and DLA itself with subpoenas for documents and deposition testimony relating to matters relevant to the Pennsylvania Litigation. Between March 14, 2014 and June 16, 2014, DLA's counsel and Agility's counsel exchanged correspondence regarding these subpoenas. Following this exchange of correspondence, DLA declined to produce any documents

other than the resumes of Mr. Lussier and Mr. Kowalski, and refused to allow its employees to be deposed.

50.     On June 24, 2014, following DLA's refusal to provide the documents and testimony requested, Agility filed a lawsuit in this Court under the Administrative Procedure Act and the Declaratory Judgment Act, seeking to compel compliance with its subpoenas.  See Agility Public Warehousing Co., et al., v. Department of Defense, et al., No. 14-1064 (JDB).  Shortly thereafter, the parties filed cross-motions for summary judgment.

51.     On December 11, 2014, while the litigation was still pending in this Court, DLA's counsel agreed to produce documents and to make Mr. Lussier and Mr. Kowalski available for depositions.  DLA agreed that Agility could ask these witnesses about their declarations, knowledge of allegations about KGL's ties to Iran, KGL's alleged damages as a result of the Wilson Letters, and questions related to bias, credibility, intent, and any other traditional means of impeachment, among other topics.

52.     On August 14, 2015, following a production of documents by DLA and the commencement of Mr. Lussier's deposition on June 29, 2015, Agility and DLA filed a joint stipulation of dismissal without prejudice.

Motion to Compel Communications Between KGL and DLA

53.     On July 23, 2014, Agility filed a motion with the Pennsylvania trial court seeking to compel KGL to produce communications between KGL and DLA that had been withheld on the basis of a purported common interest privilege.

54.     In connection with its response to Agility's motion to compel, and in an effort to substantiate its claim of privilege, KGL submitted a declaration executed by

Defendant Poling.  In that declaration, Defendant Poling asserted that, beginning in the spring of 2011, he has had "communications with counsel for KGL . . . regarding matters in which DLA and KGL have a common interest," including the identity of Scott Wilson. Ex. 21, Declaration of Daniel K. Poling ¶¶ 5-10.  Defendant Poling stated, in particular, that DLA had an interest in learning the identity of Scott Wilson because the submission of altered emails could be a criminal offense under 18 U.S.C. § 1001.  Id. at ¶ 10.

55.     On November 4, 2014, the Pennsylvania trial court entered an order granting Agility's motion to compel.  See Ex. 36.  The court began by noting that DLA and KGL "agree that they did not explicitly enter into a common interest agreement, written or otherwise," which was sufficient by itself to overcome the assertion of the privilege.  Id. at 3.  The court further concluded that DLA "clearly" did not have a "stake in the outcome" of the Pennsylvania Litigation and that the assertion of a common interest privilege therefore "borders on the frivolous."  Id. at 4.

56.     Following the Pennsylvania court's order, KGL produced a large volume of communications between its counsel and DLA relating to the Pennsylvania Litigation. Notably absent from KGL's earlier productions, however, were the key newly-produced documents showing that a DLA official, who KGL referred to as an "inside source" in a newly-produced document, forwarded to KGL a large tranche of documents on the day it filed its complaint in the Pennsylvania Litigation.  See, e.g., Ex. 17.  KGL also failed to previously produce documents revealing that a DLA official shared with KGL a number of documents related to the government's unrelated criminal and *qui tam* litigation against Agility, see, e.g., Ex. 19, including highly confidential settlement

communications between Agility and the government (including materials prepared by Agility's counsel and a formal settlement offer executed by its CEO in 2009).

Mr. Lussier's Deposition

57.     On June 29, 2015, Agility began its direct examination of KGL's "inside source" within DLA, Mr. Lussier, pursuant to its over fifteen month old March 6, 2014 deposition subpoena and the Touhy regulations.  The deposition took place at the offices of Agility's counsel in the District of Columbia.

58.      In response to questions from Agility's counsel, Mr. Lussier admitted – contrary to the statements in his sworn declaration that was reviewed by Defendant Poling and relied upon by KGL in attempting to compel the disclosure of Scott Wilson's identity – that he was not personally involved in the investigation of the Wilson Letters, see Ex. 24, Lussier Dep. 304:14–305:17, June 29, 2015; that he could not recall reading the Wilson Letters at the time they were sent and did not ever read the attachments, id. at 249:16– 250:15; that DLA suspected immediately that Agility was involved in the Wilson Letters, id. at 306:5–307:4; and that such connection would not have been material to any investigation into the Wilson Letters, id. at 307:5–309:9.  Based on this testimony, Mr. Lussier conceded that statements in his declaration – which had been drafted by KGL's counsel – were not truthful.  See id. at 309:17–19.

59.     Following this admission by Mr. Lussier that his declaration, made under penalty of perjury, contained false statements, Agility's counsel and DLA's counsel agreed that Mr. Lussier should be advised of his right under the Fifth Amendment not to incriminate himself.  Id. at 312:3–313:6, 314:2–315:8.  DLA's counsel asserted that the "best course [was] to suspend the deposition and give the parties and Mr. Lussier an

23

opportunity to fully vet the issue so that there is a complete understanding and so that there are no implications regarding representation and who is being represented in this litigation." Id. at 316:4-21.  Accordingly, the parties agreed to suspend Mr. Lussier's deposition.

**60.** Shortly thereafter, and following Agility's separate identification of documents showing that Mr. Kowalski had also made a number of misstatements in his declaration, DLA (through Defendant Coyne) wrote to KGL and Agility to withdraw both declarations.  See Ex. 37.  Specifically, Mr. Coyne stated that "[a] review of the content of those declarations by [DLA] has determined that both of those declarations contain material errors" and that DLA therefore "does not authorize continued use of the two declarations" and requested that KGL notify the Pennsylvania Court that the declarations "have been determined to be erroneous and that the declarations should not be used or considered for any purpose."  To date, however, KGL has not withdrawn Mr. Lussier's declaration from the Pennsylvania Litigation.[5]

**61.** On October 31, 2015, Mr. Lussier officially retired from government service.  Mr. Lussier requested individual representation from DOJ prior to resuming his deposition.  That request was denied because, upon information and belief, DOJ concluded that it was not in the interest of the United States to provide such representation.  Upon information and belief, Mr. Lussier remains unrepresented in his personal capacity in connection with the Pennsylvania Litigation.

---

[5] On September 30, 2015, in response to a request from KGL's counsel, Mr. Kowalski executed a revised declaration that omitted those statements that Agility had demonstrated to be false. Mr. Lussier has not executed a revised declaration.

62. On December 15, 2015 and again on February 5, 2016, Mr. Lussier's deposition continued. Once again, the deposition took place at the offices of Agility's counsel in the District of Columbia. Notwithstanding Mr. Lussier's lack of separate representation, DOJ counsel and Defendant Poling both explained after the deposition resumed that they were representing DLA as well as Mr. Lussier "in his official capacity as a former employee of the Defense Logistics Agency." Ex. 38, Lussier Dep. 177:11-179:1, Feb. 5, 2016. This was apparently news to Mr. Lussier, who did not believe he was represented by counsel at the deposition. Id. at 177:4-10, 177:20-178:12, 179:7-15.

63. During the course of Mr. Lussier's deposition, DLA's counsel objected on behalf of DLA to a number of questions posed to Mr. Lussier on the basis of the Touhy regulations, the deliberative process privilege, the attorney-client privilege, and the attorney work product doctrine. DLA's counsel instructed Mr. Lussier not to answer such questions, and he generally followed those instructions. These objections were without merit, as the questions posed did not seek privileged information and related to DLA's cooperation with KGL in its response to the Wilson Letters; bias, credibility, intent, and other traditional means of impeachment; and issues raised by the documents and communications produced in response to Agility's document requests – all of which fall within the terms of Agility's Touhy request as granted by DLA in resolution of the prior litigation.

64. Agility completed its initial questioning of Mr. Lussier on February 5, 2016, and the parties agreed to resume the deposition on March 2, 2016 for the purpose of questioning by KGL followed by re-cross by Agility.

65.     Shortly after midnight on Saturday, February 27, 2016 – mere days before Mr. Lussier's deposition was scheduled to resume – KGL produced nearly 3,000 pages of communications between KGL and DLA, including a large quantity of previously undisclosed communications between Mr. Lussier and KGL's counsel.

66.     The overwhelming majority of the key newly disclosed documents were not produced by DLA in connection with the prior litigation (see supra ¶¶ 5-6), notwithstanding the fact that they should have been in DLA's possession, custody and control at the time of the production and include search terms agreed upon by the parties. All of this points to the irrefutable conclusion that these documents should have been produced by DLA but were not.  Moreover, the documents reveal, among other things, that the government's prior assertions of various privileges, and redactions of numerous documents, were misplaced and unsupportable – including instances where the government redacted documents on the basis of the deliberative process or other privilege where such documents were forwarded by Mr. Lussier to KGL's counsel in real time. Compare Ex. 39A (produced by KGL in unredacted form), with Ex. 39B (produced by DLA in highly redacted form).

67.     To attempt to mitigate any prejudice caused by KGL's eleventh-hour production (and the government's failure to produce these documents in the first place), Agility and KGL agreed that Agility would continue its examination of Mr. Lussier on March 2, 2016 regarding the newly disclosed documents.  However, the afternoon prior to the deposition, the government advised Agility that it was not prepared to go forward with the deposition given the newly-produced documents (some of which the government acknowledged  upon initial review appeared to be documents that it should have

produced), and Mr. Lussier did not appear as scheduled.  The government refused to answer whether it had instructed Mr. Lussier not to attend the deposition.

## AGILITY'S <u>TOUHY</u> REQUESTS FOR DLA TESTIMONY

### <u>Request for Testimony from Defendants Poling and Woodward</u>

**68.**     On June 6, 2014, Agility identified Defendants Poling and Woodward as DLA employees whose testimony would be relevant to the Pennsylvania Litigation. Agility asked DLA's counsel whether he would accept service of subpoenas and/or <u>Touhy</u> requests directed to these individuals, but DLA's counsel did not respond.  Agility later reiterated this request, and was asked by DLA's counsel to make a formal <u>Touhy</u> request, with assurances that such request would be promptly considered.

**69.**     On July 16, 2015, Agility made a formal <u>Touhy</u> request to DLA for the deposition testimony of Defendants Poling and Woodward.  <u>See</u> Ex. 40.  In a letter dated August 27, 2015, DLA denied Agility's <u>Touhy</u> request, incorrectly asserting that the request was premature and that the depositions of these individuals might be cumulative and irrelevant in light of the information already provided.  <u>See</u> Ex. 41.

**70.**     On October 20, 2015, Agility wrote to seek reconsideration of DLA's decision to deny Agility's <u>Touhy</u> request.  <u>See</u> Ex. 42.  On January 20, 2016, Agility's counsel received a letter from DLA once again asserting that Agility's request for the testimony of Defendants Poling and Woodward was premature.  <u>See</u> Ex. 43.

**71.**     On January 27, 2016, Agility responded to DLA's January 20 letter regarding Defendants Poling and Woodward.  <u>See</u> Ex. 44.  Agility explained that it considered the continued refusal to grant Agility's <u>Touhy</u> request to be a constructive

denial of such request, and informed DLA that Agility intended to seek judicial relief if

no response was received by February 15, 2016.

72.     In response to Agility's January 27, 2016 letter, DLA (through DOJ

counsel) committed to providing a final response to Agility's <u>Touhy</u> request for the

testimony of Defendants Poling and Woodward by no later than March 4, 2016.

73.     On March 4, 2016, Agility's counsel received a letter denying its <u>Touhy</u>

request for the testimony of Defendants Poling and Woodward.  <u>See</u> Ex. 45.  That 16-

page letter largely rehashes arguments previously made by the agency, while continuing

to ignore or downplay not only these witnesses' involvement in the facts underlying the

Pennsylvania Litigation, but also the disparate treatment to KGL and Agility as well as

DLA's provision of materially false declarations as key evidence in the Pennsylvania

Litigation.

Request for Testimony from Defendant Pribble

74.     On January 6, 2016, Agility made a formal <u>Touhy</u> request to DLA for the

deposition testimony of Defendant Pribble.  <u>See</u> Ex. 46.  In light of Defendant Pribble's

office and supervisory role, the scope of the proposed deposition was limited compared to

that sought for other DLA employees.

75.     On February 1, 2016, DLA provided an "interim response" to Agility's

<u>Touhy</u> request for deposition testimony from Defendant Pribble.  <u>See</u> Ex. 47.  DLA stated

that the government was still reviewing the information submitted by Agility and needed

additional time before providing a final response.

76.     On February 8, 2016, Agility responded to DLA's "interim response,"

explaining that DLA's continued inaction on this matter amounted to a constructive

denial of Agility's <u>Touhy</u> request.  <u>See</u> Ex. 48.  Agility noted that more than sufficient

time had passed for DLA to make a decision on the outstanding request, and that it

intended to seek judicial relief if no response was received by February 15, 2016.

77.     In response to Agility's January 27, 2016 letter, DOD (through DOJ

counsel) committed to providing a final response to Agility's <u>Touhy</u> request for the

testimony of Defendant Pribble by no later than March 4, 2016.

78.     On March 4, 2016, Agility's counsel received a letter from Defendant

Easton denying its <u>Touhy</u> request for the testimony of Defendant Pribble.  <u>See</u> Ex. 49.

The letter cited specificity, relevance, proportionality, reasonableness and privilege as the

purported bases for the denial of the request.  It ignored Defendant Pribble's involvement

in the facts underlying the Pennsylvania Litigation as well as the disparate treatment and

false declarations.

## RELEVANCE OF REQUESTED DLA TESTIMONY

### Defendant Poling's Testimony is Relevant and Not Cumulative

79.     DLA purportedly denied Agility's <u>Touhy</u> request for deposition testimony

from Defendant Poling because it believes such testimony would not be relevant and,

even if relevant, would be cumulative of that provided by Mr. Lussier.  Contrary to that

assertion, however, Defendant Poling's testimony is plainly both relevant and not

cumulative.

80.     The documents produced in the Pennsylvania Litigation as well as the

deposition testimony of former DLA attorney Normand Lussier demonstrate that

Defendant Poling has been centrally involved in KGL's misguided lawsuit against

Agility.  Indeed, Defendant Poling has had a prominent role at DLA on questions related

to KGL and allegations regarding ties to Iran, and communicated with KGL's counsel on multiple occasions regarding their joint strategy regarding Agility and the Pennsylvania Litigation pursuant to a discredited common interest privilege.

81.    For example, as explained in correspondence to DLA on October 20, 2015, Defendant Poling inserted himself into the Pennsylvania Litigation by voluntarily providing KGL's counsel with a declaration that, upon information and belief, was outside of the Touhy process.  The declaration described the joint interests of KGL and DLA in unmasking the John Doe defendant.  Moreover, documents produced by DLA suggest that Defendant Poling was involved in DLA's response to KGL's request to obtain a declaration from Mr. Kowalski, and that he also reviewed and possibly revised Mr. Lussier's declaration, which was improperly provided to KGL outside the confines of Touhy.  See Exs. 50-52.  Notably, DLA subsequently conceded that these two declarations were materially false and has sought to have them withdrawn from the Pennsylvania Litigation.

82.    Moreover, in his deposition, Mr. Lussier on numerous occasions acknowledged that he could not answer questions related to Defendant Poling.  For example, Mr. Lussier testified that:

a.    he did not know the full scope of Defendant Poling's job responsibilities and the extent of Defendant Poling's role in the Touhy process in the agency; see Ex. 20, Lussier Dep. 77:8–78:7, Dec. 15, 2015;

b.    he did not know whether Defendant Poling was aware of Mr. Lussier's efforts to assist KGL's counsel in obtaining documents, see id. at 199:17-19;

    **c.**      he did not know that Defendant Poling had provided a declaration for KGL's counsel related to an asserted common-interest privilege, which the Pennsylvania court ultimately found to "border[] on the frivolous," nor did he know the circumstances surrounding the provision of the declaration or whether Defendant Poling voluntarily provided the declaration, see id. at 251:21–253:19;

    **d.**      he did not know why Defendant Poling was communicating with the prosecutors in Atlanta handling an unrelated civil and criminal case against Agility regarding the Pennsylvania Litigation, see id. at 91:9–13; and

    **e.**      he did not know why Defendant Poling emailed the prosecutors in Atlanta regarding KGL and DDKS, see Ex. 24, Lussier Dep. 237:22–239:19, June 29, 2015.

**83.**    These illustrative examples underscore that a deposition of Defendant Poling would in no way be "cumulative" of Mr. Lussier's testimony.

<u>Defendant Woodward's Testimony is Relevant and Not Cumulative</u>

**84.**    DLA also purportedly denied Agility's <u>Touhy</u> request for deposition testimony from Defendant Woodward because it believes such testimony would not be relevant and, even if relevant, would be cumulative of that provided by Mr. Lussier. Contrary to that assertion, however, Defendant Woodward's testimony is plainly both relevant and not cumulative.

**85.**    The documents produced in the Pennsylvania Litigation as well as the deposition testimony of former DLA attorney Normand Lussier demonstrate that, like Defendant Poling, Defendant Woodward was centrally involved in KGL's misguided lawsuit against Agility and played a key role in the investigation following DLA's receipt

of the Wilson Letters.  As Mr. Lussier testified, Defendant Woodward "was my person for all things KGL" and was one of the DLA officials "most interested" in tracking developments regarding KGL and allegations of ties with Iran.  See Ex. 38, Lussier Dep. 46:5-16, 52:22-53:5, Feb. 5, 2016.

**86.**    It is clear from documents provided by DLA that Defendant Woodward was knowledgeable and kept apprised regarding law enforcement investigations into KGL and its ties to Iran and would provide status updates to Defendant Pribble regarding the same.  See Ex. 53.  Defendant Woodward was also outspoken regarding the Wilson Letters' allegations of KGL's ties to Iran, explaining to a colleague, for example, that (at odds with the very premise of KGL's case) "these are not new allegations and rehash ones that have been made in emails from the Baragona family and in the protest on the contract."  See Ex. 11.  In one of many examples of DLA providing informal support to KGL throughout this litigation, Mr. Lussier also provided "permission/authority from DLA" for KGL's counsel to speak with Defendant Woodward, which underscores the relevance of this witness to the Pennsylvania Litigation.  See Ex. 54.  Agility should be allowed to query Defendant Woodward regarding the extent of communication with KGL's counsel and assistance given to KGL in its efforts against Agility in this matter, and her role in the investigation of the truth of the Wilson Letter allegations.

**87.**    Moreover, in his deposition, Mr. Lussier on numerous occasions acknowledged that he simply could not answer questions related to Defendant Woodward.  For example, Mr. Lussier testified that:

    **a.**    he did not know how Defendant Woodward initially received the Wilson Letters nor whether she was satisfied with DLA's response to the Wilson Letters, <u>see</u> Ex. 38, Lussier Dep. 101:21-102:5, Feb. 5, 2016;

    **b.**    he did not remember what Defendant Woodward's reaction was to allegations that KGL had ties to Iran nor did he remember whether he had discussed the subject with her, <u>see</u> Ex. 24, Lussier Dep. 145:7-14, June 29, 2015;

    **c.**    regarding key information that he requested Defendant Woodward obtain from law enforcement, he could not remember providing her a justification for asking for the documents, <u>see</u> Ex. 20, Lussier Dep. 181:13–183:11, Dec. 15, 2015;

    **d.**    he did not remember a meeting that Defendants Woodward and Pribble referenced in an email on which Mr. Lussier was included, <u>see</u> Ex. 38, Lussier Dep. 33:9-15, Feb. 5, 2016; and

    **e.**    he did not know if Defendant Woodward would have known about a <u>Touhy</u> request, <u>see</u> <u>id.</u> at 54:2-10.

**88.**    These illustrative examples underscore that a deposition of Defendant Woodward would in no way be "cumulative" of Mr. Lussier's testimony.

<u>Defendant Pribble's Testimony is Relevant and Not Cumulative</u>

**89.**    Finally, DOD has denied Agility's <u>Touhy</u> request for deposition testimony from Defendant Pribble.  Contrary to DOD's assertions, however, the well defined scope of testimony sought from Defendant Pribble is relevant, proportional, and reasonable (i.e., not cumulative).  Such testimony is not privileged, and in any event the deposition

of Mr. Lussier has shown that the government can object to specific questions that it believes (rightly or wrongly) implicate a privilege.

90.     As explained in Agility's <u>Touhy</u> request to depose Defendant Pribble, the documents produced in the Pennsylvania Litigation as well as the deposition testimony of former DLA attorney Normand Lussier demonstrate that, like Defendants Poling and Woodward, Defendant Pribble's testimony is highly relevant to Agility's defense of KGL's misguided lawsuit against it.

91.     For example, Defendant Pribble was aware of the Wilson Letters and was familiar with the status of the government's actions following receipt of such letters, including in his role as the supervisor of other agency employees within the DLA General Counsel's office.  <u>See, e.g.</u>, Ex. 53; Ex. 20, Lussier Dep. 125:11–16, Dec. 15, 2015 (testifying that Defendant Pribble was aware of the status of allegations regarding KGL's ties with Iran and would inquire for updates).  And the documents produced by DLA show that Defendant Pribble was aware of prior allegations and investigations regarding such ties, consistent with Mr. Lussier's deposition testimony that the Wilson Letters merely repeated allegations regarding KGL and Iran that had previously been brought to the agency's attention.  <u>See, e.g.</u>, Exs. 2, 55.  Defendant Pribble's testimony is directly relevant to Agility rebutting KGL's assertion that it suffered reputation harm before DLA as a result of the Wilson Letters.

92.     Moreover, documents produced by DLA and deposition testimony of Mr. Lussier show that Defendant Pribble was aware of and possibly involved in many of the efforts by DLA and its employees to cooperate with and assist KGL.  <u>See, e.g.</u>, Exs. 56-58.  Given Defendant Pribble's relevant direct knowledge of the agency's actions in

assisting KGL, and his role as the supervisor of the agency employees directly involved in those actions (including Mr. Lussier and others within the DLA General Counsel's office), his testimony is highly relevant to Agility's defense of the Pennsylvania Litigation.

93.     Alternatively, to the extent that Defendant Pribble was not aware of his subordinates' response to the Wilson Letters and their efforts to assist KGL – notwithstanding the documentary evidence and testimony to the contrary – this too would be appropriately explored through deposition testimony.  Mr. Lussier, Defendant Poling, and Defendant Woodward have squarely thrust DLA into the center of the Pennsylvania Litigation, and the agency cannot hide behind Touhy to shield the lack of appropriate oversight in that process by Defendant Pribble.

94.     Additionally, in his deposition, Mr. Lussier on numerous occasions acknowledged that he simply could not answer questions related to Defendant Pribble or else he provided testimony about Defendant Pribble's role that was plainly at odds with the documents produced by DLA or internally inconsistent with his own testimony.  For example, Mr. Lussier testified that:

      **a.**     he did not "know for sure" whether Defendant Pribble was aware of allegations of KGL's ties to Iran, see Ex. 38, Lussier Dep. 22:18–23:2, Feb. 5, 2016, yet later acknowledged that Defendant Pribble was aware of such allegations by at least March 4, 2011, see id. at 40:17-22; see also Ex. 55 (March 4, 2011 email from Defendant Poling to Defendant Pribble forwarding letters regarding KGL and the Iran Sanctions Act that KGL sent to the Army);

   **b.**  Defendant Pribble "would not" inquire for status updates, <u>see</u> Ex. 38, Lussier Dep. 23:3-8, Feb. 5, 2016, which testimony was itself inconsistent with Mr. Lussier's testimony that Defendant Pribble was in fact aware of the status of allegations regarding KGL's ties with Iran and would inquire for updates, <u>see</u> <u>supra</u> ¶ 91, and at odds with substantial DLA documentation showing DLA employees forwarding KGL/Iran related materials for Defendant Pribble's "situational awareness[;]" <u>see also</u> Ex. 53 (April 9, 2012 email from Defendant Pribble requesting information regarding whether the FBI was investigating possible contacts of KGL with Iran);

   **c.**  he never discussed the Wilson Letters with Defendant Pribble, <u>see</u> Ex. 38, Lussier Dep. 24:7-9, Feb. 5, 2016, yet this is hard to believe because Defendant Pribble and Mr. Lussier were both recipients on emails regarding the Wilson Letters, <u>see</u> Ex. 57.

  **95.**  Mr. Lussier further testified that he did not know what Defendant Pribble meant in an email but that it would not be customary to ask for clarification from Defendant Pribble because "[i]t wasn't safe" to do so and it was "[b]etter to act like you knew something than to express ignorance with Mr. Pribble." <u>See</u> Ex. 38, Lussier Dep. 31:1-21, Feb. 5, 2016.

  **96.**  Furthermore, on two occasions, the government objected to questions to Mr. Lussier regarding Defendant Pribble, and instructed Mr. Lussier not to answer the questions at all. <u>See</u> <u>id.</u> at 79:13-80:4, 208:16-209:5. These questions related to Defendant Pribble's view of and/or bias against Agility.

97.     These illustrative examples underscore that a deposition of

Defendant Pribble would in no way be "cumulative" of Mr. Lussier's testimony.  Nor is

taking his deposition disproportionate given KGL's access to DLA officials for years

prior to and during the Pennsylvania Litigation.

DLA's Ongoing Role in the Pennsylvania Litigation

98.     The information sought by Agility through the <u>Touhy</u> process described

herein is crucial to its defense against KGL's meritless claims in the Pennsylvania

Litigation.

99.     DLA has produced thousands of pages of documents in this litigation, and

these pages reveal that the agency – through the actions of the proposed deponents – both

had knowledge with respect to key issues at stake in the Pennsylvania Litigation,

including KGL's ties to Iran, and was actively involved in cooperating with KGL to the

detriment of Agility.

100.     Notably, DLA's own production of documents reflects the key roles

played by Defendants Poling, Pribble, and Woodward.  Of the 960 document families

produced by DLA, Mr. Lussier was on 644, Defendant Poling was on 530, Defendant

Pribble was on 198, and Defendant Woodward was on 349.  Accordingly, these statistics

(which do not even account for the recently uncovered documents not yet produced by

DLA that were responsive to the agreed upon terms) underscore the importance of the

deposition testimony of these DLA officials for Agility's defense in the Pennsylvania

Litigation.

101.     Amongst other involvement, DLA and its employees provided internal

agency information to KGL's counsel, provided a number of declarations, attempted to

immunize themselves from discovery through a purported "common interest" privilege, and assisted KGL's counsel in having discussions about Agility with law enforcement and the prosecutors in Atlanta.

102.    Importantly, a central component of KGL's claims against Agility in the Pennsylvania Litigation is KGL's allegation that its reputation was harmed.  Indeed, the Pennsylvania court has noted that the Pennsylvania Litigation may very well turn on whether KGL is able to prove that it was actually harmed by the Wilson Letters – not because of the expenditure of funds to investigate the letters themselves, but rather due to actual damage to reputation in the eyes of those who received and read the letters.  See Ex. 35, Dec. 8, 2015 Order at 9 (noting that KGL's "case for defamation . . . is not, in our view, a strong one" because there is "no direct evidence that [KGL's] reputation has been damaged in the eye of a specific third party or that KGL suffered a loss of its business"); id. at 9–10 ("Allegations with respect to expenditures for attorneys and lobbyists are, at best, imprecise.  We note, also, [that] Pennsylvania law . . . provides [that] a defamation plaintiff must prove actual impairment of reputation in the community and . . . it is not enough that the plaintiff be merely embarrassed or annoyed.").

103.    The primary fact witnesses identified to date by KGL with respect to the specific issue of KGL's alleged damages are DLA and its employees.  This is consistent with Defendants Poling and Woodward having been identified by Mr. Lussier as the individuals responsible for "all things KGL and Iran" within the agency, see Ex. 38, Lussier Dep. 52:22-53:5, 123:2-4, Feb. 5, 2016, and with Defendant Pribble not only having supervised these individuals – and Mr. Lussier – in their work on "all things KGL

and Iran" but also having been interested in such work and having asked for periodic updates from his employees on this issue, see id. at 56:20-57:10.

104.    Moreover, Mr. Lussier's testimony regarding key issues in the Pennsylvania Litigation was characterized, above all, by the witness's inconsistent statements as well as the witness's unabashed and admitted bias towards Agility.  Indeed, the testimony was not only rife with inconsistent testimony but also instances where Mr. Lussier would explicitly change his testimony or state that he could not remember something.  As such, the deposition lasted longer than it would have if the witness had answered the questions directly and Agility was not forced to impeach the witness on multiple occasions with his own testimony or documents, or if Agility had the key documents for Mr. Lussier that have only recently been provided to Agility by KGL.  For example, in his testimony Mr. Lussier stated that he was not responsible for making responsibility determinations yet a newly produced document shows that he offered input in connection with a responsibility determination for KGL.  See Ex. 24, Lussier Dep. 86:7-18, June 29, 2015; Ex. 59.  Accordingly, it is essential that Agility be permitted to probe these other DLA officials with relevant information lest Agility effectively be blocked from learning facts that are necessary to defend itself in the meritless Pennsylvania Litigation.  DLA cannot provide a wholly unreliable witness, limit the testimony that witness provides, fail to produce key documents related to the witness and to this case, and then prevent Agility from deposing other witnesses who can provide credible testimony on the factual issues related to the lawsuit.

105.    Finally, DLA has failed to meet its prior commitments to provide critical information sought by Agility.  As previously noted, it failed to produce plainly

responsive communications between Mr. Lussier and KGL's counsel; claimed privilege over documents forwarded by Mr. Lussier to third parties, including KGL's counsel; instructed Mr. Lussier (through DOJ counsel) not to answer highly probative questions posed at the deposition; and failed to produce Mr. Lussier for the continuation of his deposition on March 2, 2016.  Thus, DLA's ongoing role in this litigation remains partially unknown until such time as DLA corrects its prior misconduct and permits Defendants Pribble, Poling, and Woodward to testify.

106.    For the reasons set forth above, the deponents' testimony is critical to Agility's defense in the Pennsylvania Litigation.

## CAUSES OF ACTION

107.    All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth in this paragraph.

108.    Under 32 C.F.R. Part 97, it is DOD policy that official information should generally be made reasonably available for use in litigation pending in state courts unless the information is classified, privileged, or otherwise protected from public disclosure.

109.    Under 32 C.F.R. Part 97, Defendants Preston, Easton, Pribble and Coyne are authorized to release such official DOD information in response to Plaintiffs' Touhy requests.

110.    Defendants Preston, Easton, Pribble and Coyne have refused to authorize the release of official DOD information through deposition testimony in response to requests from Agility.

**111.**     Due to the refusal of Defendants Preston, Easton, Pribble and Coyne to authorize the release of official DOD information, Defendants Pribble, Poling and Woodward have not appeared for depositions.

**112.**     Neither 5 U.S.C. § 301 nor 32 C.F.R. Part 97 authorize Defendants to withhold the information sought by Plaintiffs.

**113.**     Defendants' refusal to comply with Plaintiffs' <u>Touhy</u> requests constitutes final agency action that adversely affects Plaintiffs.

**114.**     Defendants' refusal to comply with Plaintiffs' <u>Touhy</u> requests exceeded statutory jurisdiction, authority, or limitations, in violation of the Administrative Procedure Act.

**115.**     Defendants' refusal to comply with Plaintiffs' <u>Touhy</u> requests was arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedure Act.

**116.**     The Court should hold unlawful and set aside Defendants' refusal to comply with Plaintiffs' <u>Touhy</u> requests under 5 U.S.C. § 706(2).

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.     Declare that the Defendants' refusal to disclose the requested agency information and to comply with Plaintiffs' <u>Touhy</u> requests exceeds statutory jurisdiction, authority, or limitations;

2.     Declare that the Defendants' refusal to disclose the requested agency information and to comply with Plaintiffs' <u>Touhy</u> requests is arbitrary, capricious, and an abuse of discretion;

3.      Order the Defendants to comply with Plaintiffs' <u>Touhy</u> requests by

permitting depositions to be taken of Defendants Pribble, Poling and Woodward;

4.      Award costs and reasonable attorneys' fees incurred in this action to the

extent permitted by law; and

5.      Grant such other relief as the Court may deem just and proper.


Dated: March 7, 2016                            Respectfully submitted,


                                                /s/ Margaret E. Krawiec
                                                MARGARET E. KRAWIEC (Bar No. 490066)
                                                THOMAS A. PARNHAM (Bar No. 1005976)
                                                Skadden, Arps, Slate, Meagher & Flom LLP
                                                1440 New York Avenue, NW
                                                Washington, DC 20005
                                                Tel.: (202) 371-7000
                                                Fax: (202) 393-5760

                                                RICHARD MARMARO
                                                Skadden, Arps, Slate, Meagher & Flom LLP
                                                300 South Grand Avenue, Suite 3400
                                                Los Angeles, CA 90071
                                                Tel.: (213) 687-5000
                                                Fax: (213) 687-5600

                                                KRISTIN N. TAHLER
                                                Quinn Emanuel Urquhart & Sullivan LLP
                                                865 South Figueroa Street, 10th Floor
                                                Los Angeles, CA 90017
                                                (213) 443-3000
                                                (213) 443-3100  (fax)

                                                *Counsel for Plaintiffs*