**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

AGILITY PUBLIC WAREHOUSING
COMPANY K.S.C.P., et al.,

      **Plaintiffs,**

      **v.**                     **Civil Action No. 16-448 (JDB)**

**U.S. DEPARTMENT OF DEFENSE, et al.,**

      **Defendants.**

---

## MEMORANDUM OPINION & ORDER

This case arises out of two Touhy[1] requests submitted to the Defense Logistics Agency (DLA), a Department of Defense component, by plaintiffs Agility Public Warehousing and its affiliates (collectively, Agility), government contractors currently embroiled in a long-running defamation case in Pennsylvania brought by Agility's rival, Kuwait & Gulf Link Transport Co. (KGL). DLA and Agility have previously been before the Court in Case No. 14-1064, which resulted in a published opinion on earlier Touhy requests related to the Pennsylvania litigation.[2] See Agility Public Warehousing Co., K.S.C. v. Dep't of Defense, 110 F. Supp. 3d 215 (D.D.C. 2015). The parties reached a settlement in that case in which the government agreed to produce certain documents, and to make available for deposition two DLA employees, and the parties voluntarily dismissed that case. Now Agility seeks to depose three more attorneys from DLA: former General Counsel Fred Pribble, chief trial attorney Daniel Poling, and former counsel Noel

---

[1] United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951).
[2] There is currently a motion to reopen and motion for sanctions spending in Case No. 14-1064, which the Court has addressed in a separate order filed in that case.

Woodward.  DLA denied these requests, and Agility filed this case shortly afterward challenging the denial under the Administrative Procedure Act (APA).  Currently before the Court is [21] the government's motion for summary judgment and [25] plaintiffs' cross-motion for summary judgment on the APA challenge.  Agility has also filed [26] and [32] two motions to supplement the administrative record.  For the reasons that follow, the government's motion for summary judgment will be granted, and plaintiffs' motion for summary judgment and motions to supplement the record will be denied.

## I.  <u>BACKGROUND</u>

The state court litigation underlying this case arose out of two emails sent to the government in 2011, signed by someone named "Scott Wilson," alleging that Agility's rival contractor, KGL, had illicit ties to Iran, which would have rendered KGL ineligible to serve as a government contractor.  The emails, known as the Wilson letters, were referred for investigation by DLA attorneys to the Defense Criminal Investigative Service (DCIS), and eventually traced back to Agility.  Attached to the Wilson letters were purported KGL internal documents that, according to KGL, had been altered to make it look like KGL was dealing with Iran.  KGL filed suit against Agility in 2012 in Pennsylvania, bringing claims for defamation and tortious interference with contractual relationships.  In addition to the allegations about the Wilson letters, KGL also alleged that Agility engaged in wide-ranging lobbying efforts at various levels of the federal government to get KGL barred as a federal contractor, and that Agility either stole or attempted to obtain stolen proprietary information from KGL that had again been altered to make it look like KGL was violating U.S. sanctions against Iran.  AR [ECF No. 20] 10–33 (KGL's complaint).  As a result, KGL claimed that it incurred costs in protecting its reputation by responding to inquiries made by DLA, the GAO, the Army, and Congress about its ties to Iran,

and in responding to bid protests lodged against its receipt of other government contracts, including a contract in Kuwait awarded right before the Wilson letters were released. AR 36–37 (same). In its answer, Agility admitted that its employees had sent the Wilson letters, but denied that the letters were defamatory. AR 55.

Agility's theory of the Pennsylvania case is that the ongoing cooperation between DLA and KGL, both during the investigation of the Wilson letters and the litigation itself, is evidence that KGL did not suffer any damages from the letters. Therefore, in order to address the allegations in the Pennsylvania litigation, Agility has sought both documents and the depositions of various officials from DLA. The first round of requests and denials resulted in Case No. 14-1064. As part of the settlement of that case in 2015, DLA agreed to produce over 1,000 documents, and to make two of its employees—the ones sought by Agility—available for deposition: Normand Lussier, former Associate General Counsel at DLA responsible for contracting integrity, who leaked the Wilson letters to KGL's counsel, AR 88, 158–59; and Medard Kowalski,[3] the contracting officer who received the Wilson letters and forwarded them to DLA's attorneys, and who was responsible for overseeing KGL's government contract in Kuwait (known as the DDKS contract).

Lussier and Kowalski both submitted declarations in the Pennsylvania litigation in support of KGL, regarding the steps DLA had taken to investigate the Wilson letters; these declarations were later withdrawn in July 2015, when DLA discovered that each contained at least one material misstatement.[4] AR 225. Poling, chief trial attorney at DLA, also submitted a declaration in the Pennsylvania litigation in 2014, asserting a common interest privilege between DLA and KGL to

---

[3] At oral argument on the cross-motions for summary judgment, Agility's counsel indicated that Kowalski has not yet been deposed, and that counsel at this time has no intention of deposing him. Hrg. Trans. [ECF No. 39] 3:11–14.

[4] Lussier was asked to "resign" from DLA in the fall of 2015; according to Lussier, this came about after then-DLA General Counsel Fred Pribble read the deposition transcript about the declaration Lussier had submitted on KGL's behalf. Pls.' Supplemental Record [ECF No. 26-2] 123.

prevent the disclosure to Agility of communications between KGL and the government.  AR 89–91.  The Poling declaration stated that KGL and DLA had a common interest in identifying Scott Wilson, the pseudonymous author of the Wilson letters, as the government was investigating whether the Wilson letters were submitted in good faith or whether the author had violated 18 U.S.C. § 1001 by making false statements to the government.  The communications that KGL was attempting to shield from discovery had taken place in furtherance of this shared interest.  Id.  The state court ultimately rejected this privilege claim because DLA did not have a legal interest in the litigation under state law.  See Order on Common Interest Privilege [ECF No. 1-37].

Based on the information contained in DLA's agreed-upon document production, and the Lussier and Poling declarations, Agility submitted another Touhy request—one of two that are the subject of this case—to the government in July 2015.  This request sought to depose Poling and another DLA counsel, Noel Woodward, whom Agility concluded were also involved in the issues underlying the Pennsylvania litigation because they had participated in DLA's response to the Wilson letters.  AR 226–27, 244–58.  The topics of the deposition included those already agreed to by DLA with respect to Lussier, namely: (1) "standard deposition questions;" (2) questions regarding the Lussier declaration; (3) knowledge of and communications within DLA related to KGL's ties to Iran; (4) KGL's damages as a result of the Wilson letters; (5) DLA's cooperation with KGL in response to the Wilson letters; (6) "any issues raised" by DLA's document production; and (7) issues related to bias, intent, and other means of impeachment.  AR 227, 230–31.  Agility also sought to question Poling regarding (8) his 2014 declaration regarding the

common interest privilege, (9) his attendance at Lussier's deposition (at which he was acting as agency counsel),[5] and (10) "any subsequent developments relating to this litigation."  AR 227.

The parties exchanged a series of letters regarding the first new <u>Touhy</u> request between August 2015 and January 2016, with the government contending that the request was premature while the Lussier deposition was ongoing, was not sufficiently specific, and likely implicated privileged information.  AR 228–33, 410–11.  Agility disputed these arguments several times, in addition to submitting a lengthy response that expanded on its original request.  AR 234–59, 394–95, 412–16.  Before the government responded to these letters, Agility submitted a second request in January 2016, this time for the deposition of DLA's then-General Counsel, Fred Pribble, based on testimony and documents indicating that Pribble was aware of and kept informed about the Wilson letters and previous allegations about KGL's ties to Iran.  AR 727–30.  Agility sought to depose Pribble on the following topics: (1) standard deposition topics; (2) involvement/response to allegations of KGL's ties to Iran, including the Wilson letters; (3) awareness of and/or involvement in DLA's attempts to cooperate with KGL regarding the Wilson letters, and with any other litigation involving Agility; (4) any issues raised by documents produced by KGL or DLA; and (5) questions regarding bias/credibility and other methods of impeachment.  <u>Id.</u>

On February 12, 2016, DLA responded to Agility's letters, finding that Agility's <u>Touhy</u> requests were now ripe because the Lussier deposition had concluded on February 5.[6]  DLA again identified problems with the specificity and relevance of Agility's requests, and invited Agility to submit any supplemental information before the agency made its decision on the requests by

---

[5] Lussier's deposition, agreed to by DLA in Case No. 14-1064, took place over at least six days between July 2015 and April 2016.  Thus, Lussier's deposition was ongoing during the back and forth between DLA and Agility regarding Agility's second round of <u>Touhy</u> requests to depose Poling, Woodward, and Pribble.

[6] As it turns out, this was not, in fact, the end of the Lussier deposition, which continued for several more days in March and April 2016.

March 1.  AR 551–52.  Agility did not respond to this letter, although Agility and DLA did exchange brief letters regarding the Pribble <u>Touhy</u> request, AR 731–33, and DLA issued a denial of Agility's <u>Touhy</u> requests to depose Poling, Woodward, and Pribble on March 4, AR 711–726, 734–36.  In a sixteen-page denial letter, the government found that Agility had failed to show that Poling and Woodward had knowledge relevant to material issues in the underlying litigation; that the requested information was relevant to a specific issue of fact in the litigation; and that the testimony would not be cumulative of the information DLA had already provided.  DLA also concluded that the breadth of the proposed depositions posed a high risk of exposing information protected by attorney-client privilege, the deliberative-process privilege, law-enforcement privilege, and the work-product doctrine, and that the request was disproportionate and unduly burdensome given the other information that DLA has provided.  AR 711–26.  DLA denied the request for Pribble's deposition for similar reasons in a separate letter, largely echoing the reasoning of the Poling/Woodward denial letter.  AR 734–36.  Agility filed the complaint in this case three days later, seeking review under the APA.

## DISCUSSION

Summary judgment should be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits or declarations, show that there is no genuine dispute of any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986).  In its motion for summary judgment, Agility seeks review under the APA of DLA's denial of its two <u>Touhy</u> requests seeking depositions of DLA attorneys Poling, Woodward, and Pribble.  In addition, Agility has filed two motions seeking to supplement the administrative record or, in the alternative, to introduce extra-record evidence.  The Court will consider each issue in turn.

A.  DENISE OF TOUHY REQUESTS

Pursuant to 5 U.S.C. § 301, government agencies may promulgate regulations that govern how the agency will respond to third party subpoenas and requests for documents.  These regulations are often known as Touhy regulations, after the Supreme Court's decision in United States ex rel. Touhy v. Ragen, 340 U.S. 462, 467–68 (1951), in which the Court held that agency employees could not be held in contempt of court for refusing to respond to a subpoena, if instructed not to respond by a superior.  In other words, once agencies have enacted these so-called Touhy regulations (and assuming the regulations are valid), government employees cannot be forced to testify.  See, e.g., Bobreski v. EPA, 284 F. Supp. 2d 67, 73 (D.D.C. 2003) (briefly explaining the history of Touhy and Touhy regulations).  The purpose of such regulations, which typically limit the occasions on which the government will produce documents or agency employees for testimony, is "to conserve governmental resources where the United States is not a party to a suit, and to minimize governmental involvement in controversial matters unrelated to official business."  Boron Oil Co. v. Downie, 873 F.2d 67, 70 (4th Cir. 1989).

Where an agency refuses to produce the requested documents, a third party state-court litigant's "sole remedy . . . is to file a collateral action in federal court under the APA."  Houston Bus. J., Inc. v. Office of the Comptroller of the Currency, 86 F.3d 1208, 1212 (D.C. Cir. 1996).[7] The government's denial is subject to the APA's familiar "arbitrary and capricious" standard of

---

[7] As the court in Houston Business Journal explained, the remedy for the third party depends on whether the underlying litigation is in state or federal court.  In state court, the federal government is protected by sovereign immunity; thus, the state court cannot enforce a subpoena against the agency, and the third party's only option is to bring a collateral challenge under the APA.  Where the litigation is in federal court, however, the litigant may seek a subpoena under Federal Rule of Civil Procedure 45, in which case the D.C. Circuit has held that the agency's refusal to comply with the subpoena is governed by the standards of Rule 45, not the APA.  86 F.3d at 1211–12; see also Watts v. SEC, 482 F.3d 501, 507–09 & n.* (D.C. Cir. 2007) (discussing Touhy and Rule 45).  There appears to be a circuit split—or at least confusion—about whether Rule 45 or the APA should govern a court's review in the case of a federal court litigant.  See, e.g., Solomon v. Nassau Cty., 274 F.R.D. 455, 458 (E.D.N.Y. 2011) (collecting cases); In re Packaged Ice Antitrust Litig., No. 08-md-01952, 2011 WL 1790189, at *2 (E.D. Mich. May 10, 2011) (same).  The rule in this circuit, however, is clear.

review, and a court will presume that the agency action is valid unless the requester can demonstrate that "the government has refused production in an arbitrary, capricious, or otherwise unlawful manner."  COMSAT Corp. v. Nat'l Sci. Found., 190 F.3d 269, 277 (4th Cir. 1999); see also Watts v. SEC, 482 F.3d 501, 508 n.* (D.C. Cir. 2007); Houston Bus. J., 86 F.3d at 1212 n.4; Cavanaugh v. Wainstein, Civil Action No. 05-123 (GK), 2007 WL 1601723, at *4 (D.D.C. June 4, 2007); Bobreski, 284 F. Supp. 2d at 73–74.

The Court's review here is thus a narrow one.  See Citizens to Preserve Overton Park Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("[T]he [arbitrary and capricious] standard of review is a narrow one.").  "When an agency is not a party to an action, its choice of whether or not to comply with a third-party subpoena is essentially a policy decision about the best use of the agency's resources."  COMSAT, 190 F.3d at 278.  A court "must consider whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," Overton Park, 401 U.S. at 416, but the court may not "substitute its judgment for that of the agency," Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).

The DOD regulations at issue here provide that "official information should generally be made reasonably available for use in Federal and State courts and by other governmental bodies unless the information is classified, privileged, or otherwise protected from public disclosure."  32 C.F.R. § 97.4.  The regulations direct officials to consider the following "types of factors" in granting or denying a Touhy request: (1) whether the request is unduly burdensome or inappropriate under the applicable court rules; (2) whether disclosure is appropriate under the rules of procedure governing the case in which the request arose; (3) whether the disclosure would violate a statute, executive order, regulation, or directive; (4) whether the disclosure is appropriate

or necessary under the relevant substantive law concerning privilege; (5) whether the disclosure would reveal classified information; and (6) whether disclosure would compromise ongoing enforcement proceedings or constitutional rights, reveal the identity of an intelligence source, disclose trade secrets, or otherwise be inappropriate.  32 C.F.R. § 97.6(b).

Agility raises four main arguments in claiming that the government's denial of its deposition requests was arbitrary and capricious: (1) that the information it seeks is in fact relevant and non-cumulative; (2) that the government's privilege determinations are unsupported by applicable law; (3) that Agility's requests are not disproportionate or unreasonable; and (4) that the government's decision is arbitrary because it is treating Agility and KGL differently.

1. <u>Relevance/cumulativeness</u>

The dispute about whether the information Agility has requested is relevant and non-cumulative appears to be the chief point of contention between the parties.  The DOD regulations require litigants to identify "with as much specificity as possible, the nature and relevance of the official information sought."  32 C.F.R. § 97.6(c)(2).  One of the government's chief concerns about Agility's requests, as articulated in both the Poling/Woodward denial letter and in the Pribble denial letter, is that Agility asked for a broad range of information but did not detail why much of the information sought was relevant to the issues in the underlying litigation.  AR 714–15, 734–35.  Agility, on the other hand, argues that the government is taking a cramped view of what is relevant to the underlying litigation.

Agility's requested deposition topics fall into roughly two categories: information about events that took place <u>during</u> the litigation, and information about events that gave rise to the litigation (e.g., the Wilson letters).

i.      Litigation-related requests

For the most part, requests that fall into this category tend to be less relevant to the issues underlying the Pennsylvania litigation, i.e., the truth or falsity of the Wilson letters, and the damages suffered by KGL. Indeed, several of Agility's deposition requests in this category appear to be wholly irrelevant to the substantive issues underlying the litigation. For example, Agility seeks to depose Poling about his presence at the Lussier deposition, at which he appeared as DLA's counsel, serving as co-counsel with an attorney from the Department of Justice. Agility wants to know what new information Poling learned during the deposition, arguing that this is relevant because Poling was "involved" in DLA's response to the Wilson letters. AR 235–36, 241–42; see also Pls.' Opp'n [ECF No. 24] at 13. But Poling's presence at a deposition in 2015–16 appears to have little to do with the events that gave rise to the Pennsylvania litigation in 2011–12—i.e., whether the allegations about KGL and Iran are true, whether the documents attached to the Wilson letters were fabricated, and whether KGL suffered harm as a result of the letters. DLA rejected the request on this basis, finding as well that the deposition on this topic would be cumulative, unduly burdensome, and potentially involve privileged information. AR 719, 722–24.

Likewise, Agility wants to depose Poling about "developments subsequent to" the Lussier deposition, but fails to explain either what these "developments" might be, or why they are relevant to the events underlying the litigation, which took place between 2011 and 2012. AR 242, 719, 721. The government cited similar specificity problems with Agility's request to depose Poling and Woodward on "any issues raised" by any documents produced by the government so far: Agility doesn't identify any particular questions the documents might raise that are relevant to the underlying litigation. AR 718; see also AR 729, 734–35 (requests and denials regarding Pribble on the same topic). Indeed, even Agility appeared to concede at oral argument that this request is inappropriately broad. Hrg. Trans. [ECF No. 39] 72:18–73:1. The government's denial letters

also pointed out that those documents that have been produced that are obviously relevant (for example, emails showing that DLA received the Wilson letters and forwarded them to DCIS, AR 246–47) demonstrate facts that are not in dispute, making additional testimony on the subject cumulative and burdensome.  AR 718, 720, 735.  Without more from Agility, the government has articulated a reasonable basis for denying these requests—particularly given that the regulations require litigants to be specific in their requests.

However, questions about the Lussier, Poling, and Kowalski declarations appear to be more relevant than DLA allows.  DLA denied requests for depositions about these three declarations, arguing generally that these declarations were moot, and questions about them therefore irrelevant, because DLA has asked KGL to withdraw the Lussier and Kowalski declarations, and Poling's common interest privilege claim was rejected by the state court.  AR 715, 719.  Presumably, however, the facts underlying these declarations are still relevant or potentially relevant.  For example, Poling's declaration discusses DLA's and KGL's joint response to a bid protest lodged by one of KGL's competitors based on the Wilson letters.  AR 89–91.  This is seemingly relevant both to the truth of the Wilson allegations and to whether KGL was harmed by the allegations, although testimony about this may well be cumulative of other testimony or documents that the government has already produced.  Likewise, the facts underlying the Lussier and Kowalski declarations as to how DLA responded to the Wilson letters and the bid protest are still <u>relevant</u>, given the broad definition of that term.  <u>See</u> Fed. R. Evid. 401; Pa. R. Evid. 401; <u>see also</u> Fed. R. Civ. P. 26(b)(1) (defining the scope of discovery); Pa. R. Civ. P. No. 4003.1 (same).[8]  But even if

_____

[8] DOD's <u>Touhy</u> regulations appear to make Pennsylvania's rules of evidence and procedure a factor to consider in this case.  <u>See</u> 32 C.F.R. § 97.6(b).  The denial letters do not cite Pennsylvania's rules, but Agility makes no argument that the government failed to consider the appropriate factors in making its determination, or that the failure to cite Pennsylvania law alters the analysis here.  In any event, the Pennsylvania and federal relevance standards are identical.  <u>See</u> Pa. R. Evid. 401 cmt. ("This rule is identical to F.R.E. 401.").  Likewise, the Pennsylvania rule concerning the scope of discovery "incorporates the broad Federal discovery rule."  <u>See</u> Pa. R. Civ. P. No. 4003.1

the government's claims about relevance (or irrelevance) were overbroad, DLA based its decision to deny the requests on additional factors as well.

The government explained that testimony on these topics would be cumulative, or would address facts that are undisputed—which appears to be supported by the administrative record. AR 715–17; see also, e.g., AR 89–90, 246–52.  In addition, the denial letter explains that DOD regulations prohibit employees from giving opinion or expert testimony.  See 32 C.F.R. § 97.6(e). This is problematic for Agility because, with respect to the Lussier and Kowalski declarations, Agility seeks general information about "the process for awarding government contracts" and the "policies and procedures for investigating allegations of misconduct by government contractors," AR 239.  In addition to its claims about relevance and cumulativeness, DLA concluded that testimony on these subjects would be prohibited expert testimony, and pointed out that the information Agility seeks on these processes and procedures is also publicly available.  AR 715– 17.

Again, the government's overall conclusions appear to be reasonably supported by the administrative record, and Agility has offered no arguments otherwise, except to maintain generally that the information it seeks is "relevant."  But Agility offers little argument about the relevance of the litigation-related requests in particular.  Even so, relevance is not the only consideration here.  Agility treats this case as if this is an ordinary civil discovery dispute, in which the thumb is on the scale in favor of more production rather than less.  See Pls.' Opp'n at 28 ("DLA's cursory objection to the relevance of the proposed deposition testimony pays short shrift to the broad scope of relevance for discovery purposes.").  This, however, is an APA case; the decision about production rests with the agency, based on the factors provided in DOD's Touhy

---

1978 Explanatory Comment.  State courts have relied on federal discovery case law as persuasive authority on state discovery issues.  See, e.g., Dominick v. Hanson, 753 A.2d 824, 827 (Pa. Super. Ct. 2000).

regulations.  Even if the information Agility seeks is relevant to the underlying litigation, it is not automatically entitled to the depositions it has requested.  Here, the agency articulated rational reasons for denying the litigation-related requests: they are not relevant, or even if they are relevant, they are cumulative of information the government has already produced, would run afoul of DOD's regulations regarding expert testimony, or the information is already publicly available.

   ii.  Requests regarding underlying events

   Ironically, there are really only two deposition requests dedicated to the events giving rise to the Pennsylvania litigation, untethered to DLA's conduct <u>during</u> the litigation.  <u>See</u> AR 239–40. The first request in this category is about knowledge of other allegations regarding KGL's ties to Iran, including communications with others at DLA or third parties about these allegations.  <u>Id.</u> Again, the government's denial letters made a general claim that Agility did not sufficiently explain why this information is relevant to material issues of fact in the underlying litigation.  AR 717, 735.  But this information is clearly relevant, since part of Agility's theory of the defamation case is that KGL's reputation was not harmed because no one in DLA took the allegations seriously, as similar allegations about KGL and Iran had been made before.  AR 240.  Again, however, the denial letters went on to identify other reasons for denying the requests to depose Poling, Woodward, and Pribble about these other allegations.

   More plausibly, the denial letters argued that even if Poling, Woodward, and Pribble have relevant information on this topic, it is cumulative of Lussier's testimony and the documents that DLA already produced—including email conversations involving Poling, Woodward, Lussier, and others at DLA—which make it clear that previous allegations had been made about KGL and Iran and that DLA officials were somewhat non-plussed about the Wilson letters.  AR 717, 735; <u>see also, e.g.</u>, AR 114–134, 144–45, 246–49.  Agility pointed out in one of its letters to DLA that DLA

did not search either Woodward's or Poling's email archives during its previous document search/production, meaning that Poling and Woodward's testimony on this subject would not be cumulative.  AR 240.  However, based on the Lussier deposition, the exhibits read in to that deposition, and the other examples of email communications that Agility sent to the government, all of which are in the administrative record, Agility already has many, many documents and emails from within DLA regarding previous allegations made against KGL and how DLA responded to them.  The Lussier deposition focuses on this subject at length, and again, many of the documents DLA has produced include email exchanges on this topic involving Poling and Woodward.  See, e.g., AR 246–252.

Thus, while it is possible that depositions of Poling, Woodward, and Pribble would produce different, additional facts that have not already come to light, it seems most likely that any information learned would largely be cumulative, as the denial letters concluded.  And, as DLA has pointed out, the fact that previous allegations were made against KGL is not in dispute.  AR 717, 720.  This does not make this topic irrelevant, but it does support the government's conclusion that there would be diminishing returns to additional depositions.

The second topic in the category of substantive issues underlying the Pennsylvania litigation relates to the damages that KGL suffered as a result of the Wilson letters, and any subsequent contracts or successful or unsuccessful bids KGL may have made.  AR 240.  The government rejected this request, arguing that the proper party to ask about KGL's damages is KGL, and that KGL's complaint does not allege that KGL lost contracts as a result of the Wilson letters, nor does it allege reputational harm—it alleges costs incurred in responding to investigations and inquiries in order to prevent reputational harm.  AR 718, 721; see also AR 36–37 (KGL's Complaint).  DLA maintains that if KGL is asserting reputational harm with respect to

the DDKS contract (which KGL secured right before the Wilson letters were sent and which became the subject of a bid protest from a competitor after the letters were released), the appropriate person to question about this is Kowalski, who was the contracting officer on that project.  AR 718.

Agility did not offer much in support of the requested depositions on this topic in the letters it submitted to the agency.  It seems obvious that the question of reputational harm is relevant to a defamation suit, but DLA is correct that KGL's complaint, which is the only document in the record about KGL's specific allegations, does not actually allege reputational harm, and certainly does not allege that it lost government contracts because of the Wilson letters.  Indeed, it appears to be undisputed that KGL did not lose any government contracts as a result of the Wilson letters. Agility asserts more than once that KGL is alleging that its reputation with DLA was harmed, see AR 240, but if that is the case, Agility does not point to any document or testimony, or place anything in the record, to support this assertion.  As DLA pointed out, the complaint certainly does not allege that KGL suffered reputational harm in the eyes of Poling or Woodward, AR 718, so it is unclear what their testimony would shed light on here.

At oral argument, Agility argued more generally that any cooperation between DLA and KGL during the Pennsylvania litigation is evidence that KGL did not suffer reputational harm with DLA, because DLA and KGL had "teamed up together."  Hrg. Trans. 44:4–8.  Hence, according to Agility, depositions of Poling, Woodward, and Pribble about incidents of cooperation would produce information relevant to the damages issue.  Assuming that Agility is correct that KGL is arguing it has suffered reputational harm with DLA specifically, DLA's response to the Wilson letters and the fallout from this is already well documented.  DLA's cooperation with KGL to defend the bid protest over the Kuwait contract and to support the Pennsylvania litigation is

likewise well-documented.  Thus, it again appears that Poling, Woodward, and Pribble's testimony on the damages issue would be cumulative of the information Agility already has, and Agility has been unable to clearly identify anything suggesting otherwise.

Regarding Pribble in particular, Agility offers very little to explain what information he could have that is relevant to the litigation which has not already been produced to Agility.  It relies on the fact that Pribble, as General Counsel for DLA, was "aware of" the Wilson letters, and periodically asked for updates from his subordinates—Poling, Woodward, and Lussier—about the status of the investigations of the Wilson letters and KGL's ties to Iran.  See, e.g., AR 291–92, 728; see also Compl. ¶¶ 91–92; Pls.' Exs. 56–58 [ECF Nos. 1-58–1-60].  But Agility has cited to no evidence, either in the administrative record or even in its briefing and exhibits before the Court, which indicates that Pribble had anything more than second-hand knowledge about any of the events at issue in the Pennsylvania litigation.  DLA's claim in its denial letter that the deposition of Pribble would be cumulative of the information that the government has already produced is thus substantiated by the record.  See AR 735.

In its briefing, Agility relies heavily on Cavanaugh v. Wainstein, Civil Action No. 05-123 (GK), 2007 WL 1601723 (D.D.C. June 4, 2007), for support of its relevance argument.  In that case, the plaintiff brought suit against the Federal Retirement Thrift Investment Board, a government entity, for breaches of fiduciary duty.  The defendants relied on an advice of counsel defense, and the plaintiff sought to depose the four DOJ attorneys who had provided the advice at issue to the Board.  Id. at *2–3.  DOJ denied the plaintiff's Touhy request to depose the four attorneys at issue, concluding that all but one of the proposed deposition topics regarding this advice were irrelevant, but the court found this denial arbitrary and capricious.  Id. at *3, 7.  As the court explained, once the defendants put the government attorneys' advice at issue, by asserting

an advice of counsel defense, that advice became highly relevant to the underlying litigation, and the attorneys themselves had firsthand knowledge of the advice given. Id. at *6–7.

But Cavanaugh is inapposite. Here, the government is not a party to the underlying litigation, and any legal advice given by Poling, Woodward, and Pribble is not at issue. Indeed, DLA's only relevant actions with respect to the issues giving rise to the Pennsylvania litigation are the actions that it took in response to the Wilson letters. Agility argues that "testimony from these DLA officials likely will show that they knew of prior allegations of ties between KGL and sanctioned Iranian entities, did not take the claims in the Wilson letters seriously, and continued to work closely with KGL following receipt of the Wilson letters." Pls.' Opp'n at 31. But these actions have already been well-documented by the 15,000 pages of documents that DLA previously produced, as well as the lengthy deposition of Lussier. See AR 725, 735. Agility focuses on the fact that the information it seeks is "relevant" and ignores the fact that the information is also cumulative of the extensive discovery it has already received from the government. While the Court may quibble with some of DLA's claims about relevance, the government reasonably explained in its denial letters that, even if some of Agility's requests are relevant, they are cumulative of the information the government has already produced.

2. Privilege

Agility next claims that the government's denials of its deposition requests are arbitrary and capricious because the government incorrectly argued in its denial letters that attorney depositions are disfavored, and because the government improperly asserted attorney-client privilege. Here, too, Agility's claim is ultimately unpersuasive.

In the Poling/Woodward denial letter, DLA argued that attorney depositions are generally disfavored, citing a line of cases that started in the Eighth Circuit. AR 724 (citing Shelton v.

17

American Motors Corp., 805 F.2d 1323, 1327 (8th Cir. 1986)).  But Agility observes, correctly, that the Shelton line of cases only holds that depositions of opposing trial counsel are disfavored, and in particular, only where a deposition of opposing counsel risks revealing counsel's trial strategy, meaning that these cases do not support the government's findings.  Pls.' Opp'n at 36; see, e.g., Shelton, 805 F.2d at 1327 ("We do not hold that opposing trial counsel is absolutely immune from being deposed.") (emphasis added); Sterne Kessler Goldstein & Fox v. Eastman Kodak Co., 276 F.R.D. 376, 379–80 (D.D.C. 2011) (explaining the Shelton factors); United States v. Phillip Morris Inc., 209 F.R.D. 13, 16 (D.D.C. 2002).  DLA's attorneys are not opposing counsel in the underlying litigation; thus, this argument does not support the denial of Agility's deposition requests.  However, even if DLA's argument about Shelton and attorney depositions is incorrect, both denial letters are very clear that they considered multiple factors in a totality-of-the-circumstances-type analysis, and that the Shelton argument is merely one limited point supporting denial.  AR 713, 735.  The Court will not find the decision to deny the deposition requests arbitrary and capricious solely because a small part of DLA's analysis is off, if the overall conclusion is reasonable and supported by the rest of the analysis.

Regarding the privilege issue, Agility claims that the denial letter "perfunctorily" asserted privilege without bothering to establish that any privilege elements have been met, and that the proper forum to assert privilege claims is in the deposition in response to a particular question, not beforehand as a means of evading the entire deposition.  Pls.' Opp'n at 36–37.  Of course, if DLA based its denial on a legally incorrect assertion of privilege, that would be an arbitrary and capricious decision.  See, e.g., Puerto Rico v. United States, 490 F.3d 50, 70–71 (1st Cir. 2007).  But the Poling/Woodward denial letter's argument about privilege does not appear to be a legal assertion of privilege—it seems rather to be a policy argument about the risk of disclosure of

privileged information from the depositions and the burden dealing with privileged matters would place on the agency.

The letter noted that both Poling and Woodward were full time DLA attorneys during the relevant time period and that Agility's requested deposition topics are about their work as attorneys for DLA, meaning that many questions posed could <u>potentially</u> deal with privileged matters.  AR 723.  Given the breadth of the deposition topics and the time period at issue (about six years), DLA argued that it could be very difficult for Poling and Woodward, and their counsel, to sort through on the fly which questions or answers touch on privileged matters and which do not.  Therefore, DLA concluded that the risk of inadvertent disclosure is high.  <u>Id.</u>  Moreover, the letter concluded that inadvertent disclosure could be particularly damaging for the agency because the agency is (or was at the time) also involved in a pending criminal case and False Claims Act case against Agility.  <u>Id.</u>; <u>see also</u> AR 578–689 (criminal indictment and civil complaint in other cases).  Accordingly, the letter found that the risk of disclosure and the burden this places on the agency was a "strong factor militating against" approval.  AR 724.  This is a policy determination, not a legal conclusion.

The Pribble denial letter was less careful in its discussion of this topic, and does seem at some points to broadly assert that the information sought in the depositions is all protected by various privileges, which is almost certainly incorrect.  AR 735.  But, at the end of the privilege section, the letter ultimately walked back these broad assertions and concluded that the risk of inadvertent disclosure is high and places too great a burden on the agency, particularly combined with the fact that Pribble's knowledge is all secondhand.  AR 735–36.  Thus, this too appears to be a decision based on policy, not a formal legal assertion of attorney-client privilege.  Agility is correct that parties may not generally refuse to attend scheduled depositions on privilege grounds,

see Pls.' Opp'n at 40 (citing Goldstein v. FDIC, 494 B.R. 82, 90–91 (D.D.C. 2013); Byers v. Burleson, 100 F.R.D. 436, 439 (D.D.C. 1983)), but again Agility errs by treating this as an ordinary civil discovery dispute, rather than a Touhy request subject to an arbitrary and capricious standard of review.   In the Touhy context, DLA is certainly entitled to consider the risk to privileged information and the burden this would place on the agency in determining whether to make three of its attorneys available for deposition.   See, e.g., 32 C.F.R. § 97.6(b)(6) (agency should consider "[w]hether disclosure would . . . otherwise be inappropriate under the circumstances").   Moreover, DLA's conclusion on this issue is reasonable in light of the breadth of the requests and the limited relevance or cumulative nature of the information sought, which the Court has already discussed at length.   Accordingly, Agility's objections on this point are unavailing.

     3.   Proportionality/reasonableness

     As Agility notes in its briefs, the arguments on the proportionality and reasonableness of the deposition requests are largely derivative of the arguments regarding relevance, cumulativeness, and privilege, discussed above.   See Pls.' Opp'n at 41.   A few additional points, however, are worth noting.   First, the denial letter noted that the government has already provided a great deal of information to Agility: 15,000 pages of documents; the 3-day deposition of Lussier, which then continued for several additional days after he left government service; and permission to depose Kowalski.   AR 725; see also AR 735 (Pribble denial letter noting the same).   Second, the government pointed out that this is a matter of third-party discovery, and that courts are generally more sensitive to the discovery costs imposed on third parties.   AR 726 (citing Watts v. SEC, 482 F.3d 501 (D.C. Cir. 2007)).   The government is not a party to the KGL/Agility litigation, but has already spent a great deal of time and resources reviewing and producing documents and offering two employees for deposition.   Producing Poling and Woodward for deposition, DLA

found, is not worth the cost, even if there is some marginally relevant, non-cumulative, non-privileged information that could be obtained.  Agility, furthermore, did not present any evidence indicating that it is lacking critical information to its defense that cannot be—or has not already been—obtained elsewhere.  AR 726; cf. United States v. Fleet Mgmt. Ltd., Crim. No. 07-279, 2008 WL 1848102, at *4 (E.D. Pa. Apr. 24, 2008) (denying a motion to quash and holding that it was an abuse of discretion for DHS, pursuant to its Touhy regulations, to refuse to provide a witness who was "critical to the[] defense" in a criminal case).  The conclusion was roughly the same with respect to Pribble, except that DLA pointed out that Pribble's knowledge is all secondhand, which further weighed against deposing him.  AR 735.

These conclusions are reasonable.  The government has based its denial decisions on multiple factors articulated in DOD's Touhy regulations, and ultimately concluded that the balance of these factors weighs against allowing the depositions.  Pribble was not a direct participant in the events giving rise to the Pennsylvania litigation; he received his information from his subordinates.  Poling and Woodward were certainly involved in DLA's response to the Wilson letters—but DLA was not the agency responsible for investigating the truth of the Wilson allegations, and Agility has not pointed to anything suggesting that Poling or Woodward would have much to say about the harm KGL suffered, a key element of the defamation claim.  They may well have some information that is potentially relevant, but it does not appear that they have much relevant information that has not already been produced either by the government or by KGL.  In short, these depositions seem likely to be a repeat of what has come before, with little new information gained.  On the other hand, the government has raised valid concerns about the cost and burden these depositions would impose, particularly in the context of third-party discovery. The Court may not substitute its judgment for that of the agency about the agency's use of its own

resources where DLA has considered the relevant factors and articulated a rational basis for its decision.  See, e.g., Motor Vehicle Mfrs., 463 U.S. at 43; COMSAT, 190 F.3d at 278; Davis Enters. v. EPA, 877 F.2d 1181, 1187 (3d Cir. 1989); CCA of Tennessee, LLC v. Dep't of Veterans Affairs, No. 09-cv-2442 WQH (CAB), 2010 WL 1734953, at *8 (S.D. Cal. Apr. 27, 2010); City of Ashland v. Schaefer, Civ. No. 08-3048, 2008 WL 2944681, at *6 (D. Or. July 31, 2008); Bobreski, 284 F. Supp. 2d at 80.

    4.   Disparate treatment

       Finally, Agility argues that DLA has acted arbitrarily by leaking information to KGL and/or approving KGL's Touhy requests during the course of the Pennsylvania litigation, while requiring Agility to fight tooth and nail for information.  Pls.' Opp'n at 23–27.  The thrust of Agility's argument in this case, and in the underlying litigation, is that DLA is biased against it and has been conspiring with KGL for the entirety of the Pennsylvania litigation.  It certainly appears to be the case that Lussier, at least, was leaking information to KGL even before the Pennsylvania litigation was filed; that is clear from his deposition and does not seem to be in dispute.  Lussier's declaration submitted on KGL's behalf also seems to have been provided outside the Touhy process, and Lussier appears to have provided KGL's counsel with Noel Woodward's contact information after she left DLA.  AR 166, 258.  However, the government argued, both in the denial letter and in its brief here, that KGL only ever sought limited documents from and interviews with DLA officials; it did not seek formal depositions of multiple DLA attorneys or the extensive document production that Agility has sought.  See Defs.' Reply at 3–4; AR 712 n.1.

       "Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record,

its action is arbitrary and capricious and cannot be upheld." Anna Jacques Hosp. v. Sebelius, 583 F.3d 1, 7 (D.C. Cir. 2009). But there is little helpful case law on what constitutes "disparate treatment" in the Touhy context. The only Touhy case that Agility has identified in which a court found disparate treatment is one where the government produced documents to a defendant, but refused to provide the exact same documents to his co-defendant. See SEC v. Chakrapani, Nos. 09 Civ. 325 (RJS), 09 Civ. 1043 (RJS), 2010 WL 2605819, at *10 (S.D.N.Y. June 29, 2010). The court in that case found that the government had offered no credible reason why it could produce the documents to one defendant but not to the other; thus, the government's decision was arbitrary. Id.

Here, Agility complains that it has had to work harder to obtain information from DLA, but it has not identified any circumstance in which it submitted a request similar to one submitted by KGL, but which was treated differently. Thus, the Chakrapani case is of no help. Clearly, the level of effort and expense involved for the government when a party is seeking only a declaration or interview on a particular topic is different than when a party is seeking a formal deposition on ten different topics spanning a period of six years. Nor, for that matter, has Agility identified specific information or documents that KGL obtained from DLA but that Agility has been denied. Thus, while the government does not appear to have been entirely even-handed in the underlying litigation, or has made some questionable decisions, Agility has not shown that the government's actions rise to the level of being arbitrary and capricious, particularly when DLA articulated good reasons for denying the Touhy requests, as the Court has already explained.

In short, the Court finds that DLA articulated rational reasons, supported by the administrative record, for denying Agility's Touhy requests, and has made no clear error in judgment. See Overton Park, 401 U.S. at 416. DLA reasonably concluded that the depositions of

Poling, Woodward, and Pribble would produce largely cumulative information of limited relevance to the Pennsylvania litigation, and that allowing the depositions is therefore not worth the burden on the agency given the cost, concerns about the risk of disclosure of privileged information, and the fact that the agency has already produced a great deal of information to Agility.  Accordingly, the Court will grant the government's motion for summary judgment, and deny Agility's motion for summary judgment.

### B.  Motions to Supplement the Administrative Record

Agility has also filed two motions to supplement the administrative record, or in the alternative, to submit extra-record evidence.  See First & Second Mots. to Suppl. [ECF Nos. 26, 32].  The first motion, which seeks to introduce a 400-page supplemental record compiled by Agility, principally contains transcripts from the additional days of Lussier's deposition, which took place in March and April 2016, after DLA's denial of Agility's two Touhy requests.  See Pls.' Supplemental Record [ECF No. 26-2].  The second motion appears to be a series of blog posts and online news articles about this case, which appear to be based largely on the allegations in the parties' filings in the Pennsylvania litigation and in federal court.  See Exs. A–C, Second Mot. to Suppl. [ECF No. 32-1–32-3].

Typically, a court's review of agency action is limited to the record information that was before the agency decision makers at the time; thus, the introduction of supplemental or extra-record evidence is generally not permitted.  Cmty. for Creative Non-Violence v. Lujan, 908 F.2d 992, 998 (D.C. Cir. 1990); see also SEC v. Chenery Corp., 318 U.S. 80, 88 (1943).  To overcome the "strong presumption that an agency has properly compiled the entire record of materials that it considered," plaintiffs must "put forth concrete evidence that the documents it seeks to add" to the administrative record were actually considered by the decision makers.  See Tindal v. McHugh,

945 F. Supp. 2d 111, 123 (D.D.C. 2013) (internal quotation marks omitted); Nat'l Mining Ass'n v. Jackson, 856 F. Supp. 2d 150, 157 (D.D.C. 2012).   Alternatively, to introduce extra-record evidence, i.e., evidence that was never before the decision makers, plaintiffs "must first establish that the agency acted in bad faith or otherwise behaved improperly, or that the record is so bare that it prevents effective judicial review."  Jackson, 856 F. Supp. 2d at 156–57 (internal quotation marks omitted).  This exception is described as being appropriate only in the context of "gross procedural deficiencies."  CTS Corp. v. EPA, 759 F.3d 52, 64 (D.C. Cir. 2014) (emphasis omitted).

Thus, Agility has a high bar to overcome if it wants to either supplement the administrative record or introduce extra-record evidence, and the Court is skeptical that Agility would meet either of those standards in this instance.   Fortunately, the Court need not actually reach this issue. Having carefully reviewed the additional materials that Agility has submitted, the Court finds that they are largely cumulative of the information already in the administrative record.  As previously noted, the information contained in the blog posts and articles, even assuming they are proper evidence for the Court to consider, appear to be a rehash of the filings in the Pennsylvania litigation and in Agility's APA challenges to DLA's denials of its various Touhy requests.  The additional days of the Lussier deposition likewise are consistent with the evidence in the administrative record about the roles the proposed deponents have played in this saga.   There is no new information here that alters the Court's conclusions about the propriety of DLA's denial of Agility's Touhy requests.  Accordingly, the motions to supplement are denied as moot.

## **CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that [21] the government's motion for summary judgment is **GRANTED**; it is further

**ORDERED** that [25] Agility's cross-motion for summary judgment is **DENIED**; and it is further

**ORDERED** that [26] and [32] Agility's motions to supplement the administrative record are **DENIED**.

**SO ORDERED**.


_____/s/_____

JOHN D. BATES

United States District Judge

Dated:  <u>March 30, 2017</u>